[No. 35018. *En Banc.* October 27, 1960.]

GREGORY SHERMAN, *a Minor, by his Guardian at Litem, Respondent*, v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 356 P. (2d) 316.

*Carl P. Zapp, Leo A. Anderson, A. C. Van Soelen,* and *John A. Logan,* for appellant.

*Kahin, Carmody & Horswill* and *Richard B. Ward* (*Harold Fardal,* of counsel), for respondent.

DONWORTH, J.—This action was brought on behalf of Gregory Sherman, a three-year-old child (hereinafter referred to as respondent), to recover damages for injuries sustained by him on appellant's premises at the Diablo dam site located in the mountains in Whatcom county.

The nature of the action is more fully described in the complaint, which alleges, in part:

"III. That at the power project maintained by the defendant at Diablo on the Skagit River in the State of Washington, the defendant city maintains housing and other premises in the vicinity of the power house for the use of employees of the City on the project, and their families, and the public; that the minor plaintiff was at all times living on said power project premises; that also on said premises the City of Seattle maintains a lift apparatus which is a platform on wheels running on rails extending up a hill from a road at the foot of the hill to a machinery house at the top of the hill, which is operated by the means of cables and by an operator stationed in the machinery house. That on or about the 14th day of April, 1957, at about 1:20 o'clock P.M., the claimant was in close proximity to one of the rails upon which the lift operates, and at said time the said lift descended and the wheel and lift passed over him causing him injury and damages hereinafter set forth due to the negligence of the defendant as hereinafter set forth."

After setting forth the alleged negligence of defendant in fifteen different particulars, the complaint continues:

"V. That as a result of being run over as aforesaid, the claimant Gregory Sherman sustained the following injuries: his left arm was so severely injured that it had to be amputated; his whole body was shocked and injured, and his nervous system damaged; he was caused extreme pain and suffering, which will continue indefinitely in the future, and will suffer all handicaps that [are] inherent in the loss of the arm, through the rest of his life; that all of his injuries are permanent in nature, and he has suffered permanent disability."

The prayer of the complaint, which was amended before trial, sought $200,000 in damages.

Appellant, by answer, denied any negligence on its part and affirmatively alleged that respondent was a trespasser.

The case was tried to the court sitting with a jury. Appellant's motion for a directed verdict at the close of all the testimony was denied. The matter was then submitted to the jury, which returned a verdict in favor of respondent for $74,900. Appellant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial was denied. Thereafter, the trial court entered judgment upon the verdict and this appeal followed.

Appellant's seven assignments of error are directed to the denial of its motion for a directed verdict; to the denial of its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial; to certain instructions given; to instructions refused; and to entering a judgment for respondent in the sum of $74,900.

Respondent's theory of the case is that the "landowner-visitor" rules of liability are inapplicable to the case at bar, and that appellant owed him the duty of exercising reasonable care; that if the "landowner-visitor" rules of liability do apply, then respondent was an invitee; that if respondent was not an invitee, then the attractive nuisance doctrine applies.

Appellant's defense to the action is twofold: (1) Respondent, as a matter of law, was a trespasser, so that the only duty owed him by appellant was to refrain from will-

fully or wantonly injuring him. (2) The doctrine of attractive nuisance does not apply here.

The facts surrounding the accident are of vital importance.

All the land in the vicinity of the Diablo dam site is owned by appellant. The streets and other thoroughfares were laid out by appellant, and all the public buildings and houses were located and built by it for occupancy by its employees. These buildings and homes are maintained and controlled exclusively by appellant. The only persons who live in the area are employees of the city light department who are engaged in the operation and maintenance of the Diablo dam and powerhouse. The electricity produced by this plant is transmitted to Seattle for use by the inhabitants thereof. Diablo is in all respects comparable to a company town exclusively owned and controlled by a privately-owned power company.

The multiton lift involved in this action had been used by appellant since 1929 to transport passengers and freight up and down a 550-foot hill between the "town" and the Diablo dam. This hill has a slope of approximately sixty-nine degrees. The lift consists of a large steel platform with elongated supports on the lower side to make the platform deck level. It operates on wheels which run on three sets of railroad-type tracks. The lift is pulled up the incline by means of cables which wind around a motor-driven drum in the head house located at the top of the tracks. The downward trip is controlled by the motor-driven drum which unwinds the cables so that the descent is at a speed of less than one mile per hour. Thus, the trip would take approximately six minutes.

The lift moves very quietly and its movements are controlled by an operator who sits in the head house and starts or stops it by means of a hand lever. The operator's view to the bottom of the incline is obstructed by the lift itself until it reaches a point approximately halfway down the incline, and then the operator has a view through the underside of the lift to the bottom of the incline. The evidence discloses that in this instance the operator had more than

a minute in which to observe respondent's presence on the track prior to the accident.

The bottom terminus of the lift is immediately adjacent to a public thoroughfare. The community commissary, post office, storage locker, and a waiting station for the bus are located within one hundred feet thereof. The community school playground is less than two hundred feet away.

The evidence establishes that children frequented the area around the bottom of the lift incline. Mr. Orland Howell, who was the operator of the lift at the time of the accident, testified on direct examination that he had seen children around the bottom terminus of the lift "quite a few times," and that he kept a lookout for children when operating the lift.

There was no fence or other barrier at the bottom terminus to prevent access to the lift area. There was no braking mechanism on the lift itself or at the bottom of the hill to stop the lift in case of an emergency. Nor was there any warning device on the lift that could be used by passengers to warn the operator of any danger that might arise during the course of its ascent or descent.

Respondent's father was an employee of appellant. Appellant furnished houses in two areas for its workmen and their families. One group of houses, known as Reflector Bar, was located adjacent to the bottom of the lift. Downstream from the lift, there was located the second group of houses, known as Hollywood, and it was here that respondent lived with his family.

On the day of the accident, respondent went out after lunch to play in his front yard. Apparently, he rode his elder brother's tricycle from the front yard to a point near the bottom terminus of the lift. It is approximately 2,150 feet from respondent's house to the bottom of the lift. Shortly after respondent disappeared from his front yard, his mother noticed that he was missing and immediately began searching for him. However, the mother went in the opposite direction from the route which respondent had taken.

Paul Rogers, aged twelve, was near the bottom of the lift and was the first person to see respondent. At that time, respondent was about fifty feet up the lift incline and appeared to be sliding down the hill and holding on to one of the lift rails. Paul also noticed that the lift had started to descend from the top of the incline, and he shouted a warning to respondent.

However, respondent apparently was unable to comprehend the warning because of his tender age, and he continued to hold on to the rail. Seeing that respondent seemed to be insensitive to the danger, Paul ran to a telephone booth located at the bottom of the lift incline to attempt to telephone the lift operator. However, there was no telephone book in the booth, nor was there any sign indicating the head house telephone number.

Meanwhile, respondent's plight had been discovered by Mr. Elmer Anderson, an employee of appellant, and two teen-aged girls, all of whom were riding down the incline on the lift.

Mr. Anderson first noticed respondent on the tracks when the lift was approximately one fourth to one third of the way down the slope (at least two or three minutes prior to the time the lift ran over respondent). He immediately attempted to alert the operator to the danger by yelling, whistling, waving his hat, and by giving the standard signal used in appellant's operations for stopping overhead cranes (crossing the arms). The two girls on the lift also tried to attract the operator's attention by shouting and waving their arms.

The lift operator testified that he was watching the lift and the lift incline continuously but that he did not see any unusual activities on the part of the lift passengers, nor did he see respondent on the tracks.

When the lift had descended within fifteen or twenty feet of respondent, another of appellant's employees, Mr. Bert Dukinfield, who happened to be at the bottom of the incline, saw respondent and immediately began signaling the operator to stop the lift, by crossing his arms and waving. The lift operator testified that he saw Mr. Dukinfield at the

bottom of the lift, but did not see any signals.

When the lift continued to descend, Mr. Dukinfield, who knew the head house telephone number, tried to call the lift operator from the telephone booth but received a busy signal.

The lift continued its descent, and at a point approximately thirty feet from the bottom of the incline, it passed over respondent's left arm, crushing the bone and tearing away the flesh.

As above stated, the entire locale of this accident, including respondent's home, the lift site, the school playground, the public thoroughfare, and the adjacent store buildings, was the property of appellant and was under its exclusive control.

Appellant takes the position that, although respondent was an invitee with respect to the general Diablo area, he became a trespasser upon entering the lift area.

In view of the peculiar facts of this case, we feel that the standard of care owed respondent by appellant cannot be made to depend upon respondent's technical status on appellant's premises at the time of the accident. On the contrary, we think that regardless of respondent's status—be it that of an invitee, licensee, or trespasser—appellant owed him the duty to use reasonable care.

Our conclusion with respect to the duty owed by appellant to respondent is not based upon the doctrine of attractive nuisance. The five elements which must be present before that doctrine can apply to a given case are set out in *Schock v. Ringling Bros. and Barnum & Bailey*, 5 Wn. (2d) 599, 105 P. (2d) 838 (1940). The second element is that the instrumentality or condition must be attractive or enticing to young children.

Although children frequented and played in close proximity to the bottom terminus of the lift, the record is completely devoid of any evidence that, during the twenty-eight years of its operation prior to the accident, children had ever played on the lift incline or had been attracted or enticed by the lift itself. The evidence further discloses that respondent was not attracted by the lift or its opera-

tion. He was not playing on the incline. Rather, respondent's reason for being there was that he was searching for his father (who had gone fishing elsewhere)[2] and, in the course of his search, he had attempted to climb to the top of the incline.

Since the evidence fails to establish that the lift or its operation was attractive or enticing to young children, it must be held that the attractive nuisance doctrine does not apply.

Appellant contends that the cases of *Meyer v. General Electric Co.*, 46 Wn. (2d) 251, 280 P. (2d) 257 (1955), and *Mail v. M. R. Smith Lbr. & Shingle Co.*, 47 Wn. (2d) 447, 287 P. (2d) 877 (1955), are controlling here, and conclusively establish that the only duty owed by appellant to respondent was to refrain from willfully or wantonly injuring him.

The cited cases involved an artificial watercourse and a pike pole, respectively. In the *Meyer* case, *supra*, the plaintiff was a child of two years and eight months. The child involved in the *Mail* case, *supra*, was three years of age. In both cases we held that the attractive nuisance doctrine did not apply and treated the infants as trespassers, the only duty owed them by the landowner being to refrain from willfully or wantonly injuring them.

The factual situations involved in both of the cited cases differ from that presented by the instant case in two vital respects.

First, the infants involved in the *Meyer* and *Mail* cases, *supra*, did not reside on the land on which they sustained their injuries. In the case at bar, the premises upon which

[2]Regarding respondent's reason for attempting to climb up the lift incline, the evidence shows that about a year prior to the accident his father had taken him fishing and they had taken a ride on the lift to reach their destination. On the day of the accident, respondent's father had again gone fishing. This time he went to a lake about forty miles in the opposite direction and did not go up on the lift. After the accident, when his mother asked respondent why he went on the incline he said he was looking for his father. Apparently, he thought his father was fishing at the same location where he and his father had gone the year before.

respondent resided and upon which he sustained his injury was one tract of land, which was under the exclusive ownership and control of appellant. His injury took place upon a different *portion* of appellant's land from that upon which he resided. Respondent did not enter upon appellant's land to play; he lived there permanently.

Second, the condition or instrumentality involved in the two cases cited was *passive* in nature, while here we are dealing with the *active conduct* of appellant in the operation of the instrumentality that injured respondent. Both of the cited cases could have been disposed of just as well by saying that the landowner had exercised that degree of care which was demanded by and commensurate with the circumstances.

What we have just said with respect to the *Meyer* and *Mail* cases, *supra*, applies equally well to our recent decision in *Hanson v. Freigang*, 55 Wn. (2d) 70, 345 P. (2d) 1109 (1959).

The situation here is not that of a child wandering onto an *inoperative* lift to play and then, by his own act, injuring himself. If such were the case, then the *Meyer* and *Mail* cases, *supra*, might be in point.

We think the facts of this case are more closely akin to those presented in *Helland v. Arland*, 14 Wn. (2d) 32, 126 P. (2d) 594 (1942). That case involved an action for the wrongful death of a five-year-old child who was run over by a milk truck. The child had either jumped or fallen off the left side of the truck and the left rear wheel passed over her body. In holding that the driver of the truck owed the child the duty of reasonable care, we said:

" . . . Appellants take the position that the child was a trespasser or, at best, a licensee, to whom the driver of the truck owed the duty only of refraining from willful or wanton injury. The rule of law relied on is universally applied to licensees and trespassers. And, it may be that most courts apply the rule to cases of very small children. But some few courts, *among which is ours*, have repudiated the idea that a child as young as Marlene can be in any real sense a trespasser. . . ." (Italics ours.)

Later in that opinion, we also said:

"The *Bjork* case [*Bjork v. Tacoma,* 76 Wash. 225, 135 Pac. 1005] is not determinative of the question now presented because that decision is finally rested on the doctrine of attractive nuisance. But it is authority for the proposition that the driver of the truck owed a duty greater than merely to refrain from inflicting willful or wanton injury. We think 'the more humane rule,' with respect to children who are, and can be, merely technical trespassers, is that of reasonable care. . . ."

Although the language just quoted is quite broad, it must be interpreted within the context of the facts of that particular case. It is to be noted that the decision was not based upon the doctrine of attractive nuisance. It is to be further noted that there this court was dealing with an *active* instrumentality which injured the child.

Appellant was responsible for the physical layout of this community. The arrangement was such that children not only came voluntarily but were, in fact, compelled to come in close proximity to the lift site.

 Under these circumstances, we think that the presence of a young child upon the lift site was reasonably foreseeable, not upon the basis of any past trespasses, but rather upon the basis of the lift site's proximity to a place where children were likely to be present.

We hold that, under the facts of this case, appellant owed respondent the duty to use reasonable care to not injure him regardless of respondent's status at the site of the accident.

 Appellant assigns error to the trial court's instructions on the ground that they were confusing and misleading, in that they allowed the jury to impose liability if it found that appellant was merely negligent regardless of respondent's status on appellant's land. Assignment of error No. 6, which is directed to the failure of the trial court to give certain requested instructions, is predicated upon the same basis.

In instruction No. 1, the trial court was outlining the allegations of the complaint and defining the issues for the

jury. The court referred to the maintenance of an attractive nuisance as an act of negligence. Appellant excepted to that portion of the instruction.

More specifically, appellant's position in regard to this alleged error is set out on page 41 of its opening brief as follows:

" . . . The jury under the instructions, as given, could well have found that the elements of attractive nuisance doctrine did not exist, therefore the appellant was not negligent in that regard, but that the appellant was negligent and liable (regardless of respondent's status) because the operator failed to observe the signalling, or that the area should have been fenced, etc.

"The jury were not instructed that the other allegations of negligence, such as failure to fence, failure to observe, etc. were only applicable if the jury found that there was an attractive nuisance, thus affecting respondent's status."

In other words, appellant takes the position that it did not owe respondent the duty of reasonable care *unless* the doctrine of attractive nuisance applied.

While appellant is correct in stating that the attractive nuisance doctrine is not an element of negligence but merely bears upon respondent's status at the time of the accident, we think that the error in instruction No. 1 was not prejudicial.

A similar situation was before this court in *Bronk v. Davenny*, 25 Wn. (2d) 443, 171 P. (2d) 237 (1946). In that case, the plaintiffs' property had been damaged by one of several tractors owned by defendants and left standing overnight on their property. Some boys entered the property and began playing on the tractors. One of the boys started the engine of one tractor, which was in reverse gear. This tractor backed rapidly for some distance (without a driver) and collided with a house. None of the boys was injured. In an action brought by the property owner against the tractor owner, judgment was rendered in favor of the former. On appeal, the doctrine of attractive nuisance was discussed in the decision of this court as follows:

"It was the appellants' position that negligence was without the issues of this case, that the only duty upon them was

a duty owed to the children themselves not to wantonly or willfully injure them, and that the respondent's right could not rise above the right not to be wantonly and willfully injured. The appellants argue strenuously, as they did during the trial, that the attractive nuisance doctrine has no application here, since the doctrine was created solely to relieve minor children of the consequences of their own inquisitiveness and lack of judgment, providing a right of recovery in favor of injured minor children who would otherwise be barred by contributory negligence or because of the fact that they were trespassers upon the appellants' land. Further, it is argued that the doctrine has never been extended to property damage.

"Even if we grant the correctness of the appellants' position on the scope of attractive nuisance cases generally, still we think that the instructions set out have made it sufficiently plain that the jury must find that the tractor was attractive to children before they were to pass upon the question of negligence, viz.: whether the act of an irresponsible child was one which should have been foreseen by a reasonable man in the appellants' situation. In other words, while the attractive nuisance doctrine, as limited to actions to recover for injuries to children, finds no application in this case, yet one element thereof, the element of a foreseeable attractiveness of a parked tractor to an errant child, and the appellants' failure to so secure the tractor as to prevent harm arising out of such attraction, is clearly the basis for a finding of primary negligence on the part of the appellants.

"While, under the issues of the case, it was not necessary to instruct the jury upon the attractive nuisance doctrine in its entirety, the instructions complained of, read together with the remainder of the instructions, could not have misled the jury.

" 'They contained statement of an abstract proposition of law correct in itself. Statements of abstract principles of law, which are correct, are not prejudicial, when they do not mislead the jury.' *Herndon v. Seattle*, 11 Wn. (2d) 88, 118 P. (2d) 421."

In view of our holding that appellant owed respondent the duty to use reasonable care regardless of his status, these assigned errors are without merit.

Appellant's final contention is that the verdict of $74,900 is excessive. It takes the position that, even considering the

expenses of over $1,000 already incurred, and assuming, as asserted by respondent, that the cost of future medical and prosthetic expenses will total well over $8,000, this still leaves $66,900 remaining for general damages. It is claimed that such a sum is manifestly excessive here, in view of the fact that there is no evidence of any loss of earnings.

■ Along this same line, appellant further argues that, since there was not and could not be any evidence in this case of any loss of earnings, it was error for the trial court to give the standard mortality table instruction with relation to respondent's life expectancy. It is asserted that this instruction should be given only in cases of death or where it is shown that the injured person is incapable of earning as much as he did prior to his injury.

This precise issue was presented to the Supreme Court of Missouri in relation to personal injuries received by a four-year-old child. In holding that the child was entitled to damages for prospective loss of earnings, that court said:

". . . The impairment of the earning capacity of one in his infancy is as great a damage to him, as though he had not been injured until the day he reached his majority. That he would have an equal right to compensation logically follows. This plaintiff had never earned anything, and what his ability to labor or his capacity for earning money in business pursuits will be in the future no one can tell with any certainty. It is properly held in such case, in the absence of the existence of direct evidence, that much must be left to the judgment, common experience and 'enlightened conscience of the jurors, guided by the facts and circumstances in the case.' [Citations omitted]." *Rosenkranz v. Lindell R. Co.*, 108 Mo. 9, 18 S. W. 890 (1891).

In 43 C. J. S., Infants, 266, 268, § 104, it is stated:

"An infant injured through another's tort or negligence is entitled to reasonable compensation for his injuries, and may recover for his mental or physical pain and sufferings, his permanent injuries, and for the impairment of his power to earn money after arriving at majority, although he has never earned anything and no one can tell with certainty what his earning capacity will be."

It cannot be denied that the extent to which the earning capacity of respondent has been impaired is highly un-

certain. However, in view of the very nature and gravity of the injury in this case, we feel that the jury could reasonably conclude that respondent's earning capacity had in fact been impaired. As to the extent of the impairment, we think that it was proper to permit the jury to make that determination.

It was not error for the trial court to instruct the jury as to the life expectancy of respondent. Where the injury incurred is permanent, an instruction on life expectancy is proper. *Holmes v. Toothaker*, 52 Wn. (2d) 574, 328 P. (2d) 146 (1958); *DeKoning v. Williams*, 47 Wn. (2d) 139, 286 P. (2d) 694 (1955).

What we have said above still does not dispose of the question of whether the damages are excessive. The problem has always been a most troublesome one. By what standard do we ascertain the excess?

Respondent's left arm was amputated near the shoulder, leaving a five-inch stump. During the period in which he is still growing, he will need four or five new prostheses. Upon reaching maturity, he will need a new prosthesis every three to six years for the remainder of his life. After maturity, he will also need an artificial hand, which requires periodic re-covering. During the course of his growth, he must undergo approximately three more operations to saw off the arm bone, since the bone grows faster than the skin which covers it. There is evidence that since the accident he has become withdrawn in his relationships with other people.

Respondent is entitled to adequate compensation for all damages sustained by reason of the loss of his arm, including past and future pain and suffering, mental anguish, medical and prosthetic expenses, and loss of future earnings. As stated in *Florida Power & Light Co. v. Hargrove*, 160 Fla. 405, 35 So. (2d) 1 (1948), which involved electrical burns sustained by a forty-three-year-old lineman resulting in skin grafts to his right leg and the loss of his right arm:

"The verdict in a case like this is at best but a feeble attempt to place the injured person back in the shoes he wore before the injury. In many cases, as in this one, it cannot be

done. If it were possible to do so, none of us would be willing to step into appellee's shoes and take his judgment with his handicap on condition that he step in our shoes physically normal as we are. *The elements that enter into a judgment like this are so diverse that it often requires more of humility than it does of law properly to assess them. . . ."* (Italics ours.)

■ Appellant's motion to reduce the amount of the verdict or grant a new trial upon the ground that the verdict was excessive, was denied by the trial court. The judge who heard and tried this case was in a position to evaluate the attitude and emotional reactions of the jury which rendered this verdict. It was within his discretion to grant a new trial or reduce the amount of the verdict, if he thought it were excessive or the product of passion and prejudice.

In *Huggans v. Southern Pac. Co.*, 92 Cal. App. (2d) 599, 207 P. (2d) 864 (1949), the District Court of Appeals of California in upholding an award of $91,000 to a twelve-year-old boy for the loss of his left leg below the knee and a portion of his right foot, stated:

"The award of $91,000 is attacked as excessive. The plaintiff suffered frightful and seriously crippling and disfiguring injuries. These are to be measured against a normal life expectancy of nearly 54 years (at 12 years of age the normal expectancy is 53.68, 58 C. J. S. 1212). The special damages pleaded were $11,000 and over $17,000 were proved at the trial without objection. By limiting the special damages to $11,000 and arbitrarily taking $10,000 as the measure for past and future pain and suffering appellants arrive at a figure of $70,000 for general damages. Then by a series of calculations they seek to prove that amortizing $70,000 over 54 years the income to plaintiff will be extravagant. 'The question of what may be reasonable compensation in cases of this kind is a matter on which there legitimately may be a wide difference of opinion.' (*Roedder v. Rowley*, 28 Cal. 2d 820, 823 [172 P. 2d 353, 354].) *The trial judge's denial of a motion for new trial is to be weighed in determining whether the judgment is excessive. (Johnston v. Long, 30* Cal. 2d 54, 76 [181 P. 2d 645].) The award for past and future pain and suffering including the mental anguish and humiliation to be reasonably expected cannot be arbitrarily limited to $10,000 for a 54-year period. We suggest only one element of shame and humiliation: the boy now goes swimming but

he crawls between the dressing room and the pool. On the whole case unless we can find that the award shocks one's sense of justice and raises the presumption that it was the result of passion and prejudice our duty is to affirm the award. [Citations omitted.] Applying that rule we cannot find the award excessive." (Italics ours.)

In *Holmes v. Toothaker, supra,* this court said:

"We have held, in actions for personal injuries where damages are proved, that the *amount* of damages to be awarded is primarily within the province of the jury. This court is reluctant to interfere with such an award, when fairly made. [Citations omitted.]" (Italics ours.)

In this case the jury thought the award was fair, and the trial judge was of the same view. In matters of this nature, we do not feel that we should presume to substitute our judgment for both his and the jury's unless this court's sense of justice is shocked by the amount of the award. That is not the situation in this case.

The judgment of the trial court is in all respects affirmed.

WEAVER, C. J., HILL, FINLEY, ROSELLINI, FOSTER, and HUNTER, JJ., concur.

OTT, J. (dissenting)—I agree with the conclusion of the majority that,

"Since the evidence fails to establish that the lift or its operation was attractive or enticing to young children, it must be held that the attractive nuisance doctrine does not apply."

I also agree with the conclusion of the majority that instructions Nos. 1 and 10 were erroneous. My disagreement is with the conjectural conclusion of the majority that the giving of these erroneous instructions was not prejudicial.

In my opinion, the questioned instructions were prejudicial. By instruction No. 1, the court outlined the issues as presented by the pleadings, and told the jury that plaintiff claimed the defendant was negligent in seven separate particulars. The instruction defined the seventh act of negligence as

"Maintaining and operating upon said premises an attractive nuisance and a condition, instrumentality and ma-

chinery which were dangerous to children of tender years and which could reasonably be expected to attract children, and failure to exercise reasonable care to protect them and particularly the plaintiff minor."

The "failure to exercise reasonable care" referred to in the above-quoted portion of instruction No. 1 was stated with particularity in the preceding paragraphs covering the other six alleged acts of negligence. By that portion of the instruction covering the seventh alleged act of negligence, the jury was told that the ownership of the property alone constituted negligence, if it was attractive to children. The doctrine of attractive nuisance was erroneously defined as one of defendant's seven acts of negligence. We cannot assume, without resorting to speculation, that the jury disregarded this improper instruction.

By instruction No. 10, the court compounded its error by defining all of the essential elements of the attractive nuisance doctrine. *If the jury followed instruction No. 10, its verdict was based upon a theory which the majority concede is not present in this case.* The jury might very well have adopted either or both of these erroneous instructions as the basis for its verdict.

In my opinion, a new trial should be granted.

MALLERY, J. concurs with OTT, J.