[No. 35576.   Department Two.   August 31, 1961.]

HARRY J. NEFF *et al., Respondents,* v. UNITED PACIFIC INSURANCE Co. *et al., Appellants.*\*

\*Reported in 364 P. (2d) 515.

*Thomas P. Keefe* (of *Walthew, Warner & Keefe*), for appellants.

*Heckendorn & McNair*, for respondents.

DONWORTH, J.—This is an appeal from a judgment in favor of respondents for damages resulting from their alleged unlawful arrest and forcible detention by three deputy sheriffs acting on behalf of the sheriff of King county. Originally, the complaint contained three causes of action, but the case was submitted to the jury on the issues involved only in the first cause.

Appellants are the sheriff, his three deputies, and the corporate surety on the sheriff's official bond. The judgment, based on separate jury verdicts, was rendered against appellants in these amounts: (a) in favor of respondents Neff and wife, $750, and (b) in favor of respondent Gould, $1500.

By pretrial order, certain admitted facts were established, such as the filing of the sheriff's official bond with the county clerk, the identity of the deputy sheriffs involved, and the fact that, at all times relevant to this case, they were acting on behalf of Tim McCullough, sheriff of King county.

Paragraphs ten to seventeen, inclusive, of the pretrial order are set forth verbatim:

"10. That on January 18, 1958, at approximately 1:30 p.m., at the intersection 4th Avenue SW and SW 108th Street within King County, Washington, plaintiff Eugene Gould was sitting in the seat of an automobile owned by Harry J. Neff. Present at the same time was plaintiff Harry J. Neff. Sometime between 1:00 p.m. and 1:20 p.m., defendant Lloyd Peterson,[1] while accompanied by his wife, Kimeko Peterson, stopped near this intersection. He stopped his automobile adjacent to where a person [Del-

_____
[1]Lloyd Peterson, referred to as a defendant in the pretrial order, was dismissed during the trial as the result of the granting of respondents' motion for a voluntary nonsuit as to the second cause of action.

ton Grayell] was standing. While so stopped alongside or on the road, Lloyd Peterson purchased a bottle of shampoo from said person standing as aforesaid, and thereupon left the intersection.

"At approximately 1:30 p.m., defendant Lloyd Peterson and defendant Peter Peterson, who is Lloyd Peterson's father, returned to this intersection in the automobile of Peter Peterson. None of the defendants were present at the intersection from the time Lloyd Peterson left the intersection until the return of Lloyd Peterson and Peter Peterson aforementioned. When said Petersons returned to the intersection at approximately 1:30 p.m., plaintiff Eugene Gould was sitting in the seat of the Neff automobile. When said Petersons arrived at the intersection, plaintiff Harry J. Neff was in the vicinity of his automobile with a box in his hands. He placed the box in the back of the automobile and then got into the car.

"Defendant Peter Peterson was driving his personal automobile which is equipped with a two-way radio with which it is possible to communicate with the Sheriff's Department radio operator at the County-City Building. Defendant Peter Peterson pulled up near the Neff automobile, got out of the car, walked over to the Neff automobile, displayed to the occupants of the Neff automobile his wallet and the Deputy Sheriff's badge therein affixed. Plaintiffs did get into said automobile of defendant Peterson. Defendant Peter Peterson told Harry J. Neff to identify himself, and he produced his driver's license, and said Peterson proceeded to copy down the driver's license information.

"Shortly thereafter at 1:40 p.m., Sheriff's Deputies O'Rourke and Charles arrived at the intersection in an official Sheriff's Department automobile, Patrol Car No. 34.

"When said O'Rourke and Charles arrived at the intersection, plaintiffs Harry J. Neff and Eugene Gould got into the Neff automobile and followed Peter Peterson to Judge Moore's court. Deputies Charles and O'Rourke then proceeded in the Sheriff's patrol car to Judge Moore's court. [Judge Moore was a justice of the peace.] Lloyd Peterson, at all times from the intersection to Judge Moore's court, was riding with his father, Peter Peterson.

"All of the parties as above-mentioned arrived at Judge Moore's court, whereupon they proceeded into the courtroom. After arriving in the courtroom, Harold Moore made out a criminal complaint and Lloyd Peterson, while under oath, did sign and execute this criminal complaint made against plaintiffs Harry J. Neff and Eugene Gould, which

complaint did charge plaintiffs and Delton Grayell with being guilty of vagrancy in that 'they were stopping cars on the highway, selling without a license, disorderly conduct.'

"Justice Moore ordered the plaintiffs to post bail of $50.00 each or to be held in the King County jail in lieu of posting bail.

"Harry Neff, Gould, and Grayell were thereupon taken by Deputy Sheriff Dan Evans, who had in his possession a warrant of arrest based on and issued after aforesaid complaint, to the King County jail, where they arrived at approximately 2:15 p.m. and were booked and held under the charge. Said plaintiffs were held in the King County jail until they posted bail. Harry Neff was held in the jail one hour; Eugene Gould was held in jail two hours and forty-five minutes. They were held under the charge of vagrancy, and no other charges were pending against them.

"Subsequently, plaintiffs were tried in the court of Justice of the Peace Harold Moore on January 22, 1958. At that trial, the case against them was dismissed;

"11. While plaintiffs were being taken to the jail, the car of Harry J. Neff was impounded and plaintiff Neff was required to expend the sum of $6.18 in order to reacquire possession of said automobile.

"12. Plaintiffs Harry J. Neff and Eugene Gould each incurred the sum of $25.00 for payment of attorneys' fees in representing and defending themselves against the charges which had been made against them as aforesaid, which were subsequently dismissed;

"13. That plaintiff Harry J. Neff, together with one Delton Grayell and in the presence of Eugene Gould, was selling a shampoo along the public roads in King County, Washington, on and prior to January 18, 1958, without a license, as required by RCW 36.71;

"14. That upon the arrival at the jail, plaintiffs were permitted to make a phone call for the purpose of obtaining bail for their release;

"15. That the plaintiffs were not handcuffed, and were at no time physically abused or physically mistreated by defendants;

"16. That plaintiffs were not expressly told they were under arrest;

"17. That the testimony taken by Judge Moore from defendant Lloyd Peterson at the hearing was the same as that given at the time of issuance of the complaint."

Appellants assign as error: (1) The trial court's denial of their motion to dismiss at the end of respondents' case; (2) the denial of appellants' motion for new trial; (3) the denial of their motion for judgment n.o.v.; (4) the entry of judgment for respondents; (5) the giving of instruction No. 1-A; (6) the giving of instruction No. 7; (7, 8, 9 & 10) the court's refusal to give four requested instructions.

On the general issue of liability, the testimony was conflicting but there was sufficient evidence (which the jury had a right to, and did, believe) to support the verdicts in favor of respondents. For example, see portions of respondent Neff's testimony quoted in the margin.[2]

Appellants contend that between the time that Deputy Sheriff Peterson arrived at the intersection of southwest 108th street and Fourth avenue, southwest, and the time the parties arrived at the justice of the peace court (estimated by the several parties as being a period of between fifteen and forty minutes), there was no arrest of respondents by any of the deputy sheriffs, because, in appellants' words, there were no:

[2]"A. We were just getting in our car to go to lunch. Mr. Greyell was getting in the back seat and I was waiting for him to get in the back seat as we were going to go to lunch when Peter Peterson come up in his car. He parked just forward of our car, got out of the car and came over and showed us his badge. He said, 'Wait in my car.' He told us to get in the car, which we did. . . . Officer Peterson got out of his car, came over to ours, and he said, 'Wait a minute, fellows.' He identified himself and said, 'Wait in my car.' Which being an officer of the law—MR. KEEFE: (Interrupting) Just a minute. Q. Did you get in the car? A. Yes, we did. Q. Did you have any choice as to whether you should get in the car or not? MR. KEEFE: I object, if the Court please. The question calls for a conclusion. THE COURT: Objection sustained. Q. (By Mr. McNair) Did you voluntarily obey his command? A. Yes, we obeyed his command. Q. Was it voluntary? MR. KEEFE: Objection. Leading and suggestive, and calls for a conclusion. THE COURT: Objection overruled. A. We obeyed his order mainly because he directed us to get into the car. We didn't do it because we felt we wanted to do it. Q. Had he shown you his badge? A. Yes, he did. Q. What did he do then? A. He at this time walked over to his car with us. Q. Who is 'us', first of all? A. Greyell and myself. Q. Where was Eugene Gould at this time? A. He was sitting in my car. Q. What did officer Peterson do? A. He walked over to the car with Mr. Greyell and myself. We got in the back seat, and I believe **he reached through the window and called the Sheriff's Department**

"1. Words of arrest spoken.
"2. Physical force exerted to compel attendance.
"3. Attempt by the respondents to leave the area.
"4. Request by the respondents to leave.
"5. Allegations of a commission of any crime.
"6. Forced transportation in any police or other vehicle.
"7. Frisking or searching of a person.
"8. Impounding of their private vehicle."

These assertions were presumably argued to the jury by appellants' counsel. The verdicts show that the jury was convinced that respondents had been arrested by the deputy sheriffs.

The argument that respondents voluntarily joined the caravan between two sheriffs' cars and proceeded to the justice of the peace court in order to be officially charged with an offense seems somewhat naive. If during this trip respondents had suddenly decided to go home for lunch, it seems reasonable to believe that the deputies would have taken prompt and effective measures to recapture them.

As we said in *Rogers v. Sears, Roebuck & Co.,* 48 Wn. (2d) 879, 297 P. (2d) 250 (1956):

on his 'phone. Q. Did he have a radio-telephone or a radio in his car? A. Yes, he did. Q. And did he make a call on that? A. Yes, he did. Q. And did he direct that you remain in the car after that? A. Yes. Q. Did two other officers, O'Rourke and Charles, arrive after that? A. Yes. Q. Where did they come in their car? A. I believe they came down and parked on this side of the street (indicating). Q. Are you sure actually where they came from? A. No, I am not sure where they came from, because we were—well, discussing the things in the car. Q. What, if anything, did officers O'Rourke and Charles do after they got there? A. When they arrived they came over and, I believe, they spoke with Mr. Peterson. They directed us to follow Mr. Peterson. Q. You mean officer Peterson? A. Yes. They directed us to follow officer Peterson to the justice of the peace court and they would follow us. Q. And what did you do then? A. Mr. Peterson got in his car— Q. Would you please refer to him as officer Peterson because we have two Petersons. A. Officer Peterson got in his car. He directed us to get in our car, which we did, and then we followed officer Peterson to the justice of the peace court with the deputies following us behind in the sheriff patrol car. Q. How close behind did they follow? A. I believe at one time, as we stopped for a sign there, I believe a car turned in between the deputies and myself. However, the deputy did pass the car and came right in behind us again. Q. Were you or were you not at that time under arrest? A. I believe we were."

"Was Mr. Rogers falsely imprisoned? He was unlawfully restrained of his liberty at the instance of Mr. VanHoose for a period of between two-and-a-half and three hours. Respondent contends that he was not placed under arrest and that he was free to go at any time. People just do not walk away from a policeman on the street, or from a police station, under circumstances such as these. Mr. Rogers was falsely imprisoned."

Without discussing the evidence further, it is sufficient to state that, unless the trial court erred in giving instructions No. 1-A or No. 7 or in refusing to give any of the four requested instructions above mentioned, the verdicts as to the issue of liability must stand.

■ Instruction No. 1-A contained a correct statement of the law applicable to the issue of liability. By it, the jury was told:

"The evidence is undisputed that no crime was committed in the presence of the officers. Therefore the issue for you to determine is whether or not an arrest and imprisonment did occur before the warrants were served, and, if so, the amount of plaintiffs' damages."

There was no evidence of any sale in the presence of the deputies. There was no way that any of the officers could have acquired personal knowledge through their senses that a misdemeanor was being committed in their presence. *Sennett v. Zimmerman,* 50 Wn. (2d) 649, 314 P. (2d) 414 (1957).

We now come to the matter of the amount of damages allowed by the jury.

■ Appellants first argue that respondents did not produce evidence as to what portion of their total damages was due to appellants' acts performed *prior* to arriving at the justice of the peace court, and what portion was due to *subsequent* events, *i.e.* after the warrants of arrest were served on respondents.

The trial court dealt with the question of apportionment of respondents' damages with the following instruction:

" . . . If you find that the original arrest and imprisonment was false, then it will be your duty, acting under these instructions, to fix the damages, if any, which were

proximately caused by such arrest and imprisonment *prior* to the actual service of the warrants." (Italics ours.)

We feel that this instruction adequately apprised the jury of the proper law regarding the issue of segregation or apportionment of damages in cases of this nature. We are precluded from considering the question of whether or not evidence which bore upon damages sustained by respondents *subsequent* to the service of the warrants was improperly admitted, since no error has been assigned to the admission of such evidence. See Rule on Appeal 43, RCW Vol. 0.

Appellants, in moving for a new trial, contended that "Excessive damages appearing to have been given under the influence of passion and prejudice" were awarded. In denying appellants' motion, the trial court stated the following:

"The Court has given thorough consideration to the argument of counsel and the rules of law involved in this case and, although the Court feels that the verdict is excessive and that if the question of damages had been left up to the Court only nominal damages would have been awarded, the Court should not substitute its own judgment for that of the Jury, particularly in a case such as this where the damage was to rights of an intangible nature and which are susceptible to no accurate method of mathematical computation. For the same reasons the Court feels that the amount of damages was particularly within the purview of the Jury and, therefore, the Court should not reduce the amount of the verdict conditioned upon Plaintiffs' acceptance of such reduction as an alternative to granting a new trial. The Court finds that the amount of the verdict is not so excessive as to indicate passion or prejudice of the Jury.

"The Defendants have contended that the Court erred in refusing to give Defendants' Supplemental Instructions, which refusal was duly excepted to by Defendants. The Court has read the Instructions again as a whole and believes the Jury was properly instructed and was not misled in view of the fact that the Court, sustaining Defendants' prompt objection, instructed the Jury that they were to disregard all testimony and evidence concerning acts occurring after the Warrants of Arrest were served."

■■ Despite the relatively short period of respondents' involuntary confinement prior to the issuance and service of the warrants, the amount of the award was within the province of the jury, and we are loath to interfere with its decision. *Duplanty v. Matson Navigation Co.,* 53 Wn. (2d) 434, 333 P. (2d) 1092 (1959); *Holmes v. Toothaker,* 52 Wn. (2d) 574, 328 P. (2d) 146 (1958); and *Anderson v. Dalton,* 40 Wn. (2d) 894, 246 P. (2d) 853, 35 A. L. R. (2d) 302 (1952). We agree with the trial court that the verdicts of the jury were not so excessive as to have been unmistakably the product of passion and prejudice.

■ There being no passion and prejudice established, the only question remaining is whether the trial court abused its discretion in refusing to reduce the amount of the verdict or, in the alternative, to grant a new trial if such reduction should not be accepted by respondents. This problem was considered in *Kramer v. Portland-Seattle Auto Freight, Inc.,* 43 Wn. (2d) 386, 261 P. (2d) 692 (1953). It was there stated that in such a situation the question to be answered is:

". . . Can it be said, as a matter of law, under the facts, that the verdict carries its own death warrant, solely by reason of its size?"

We have reviewed the evidence relating to respondents' damages in this case and cannot say that the verdicts here carry their own death warrants solely because of their size. While, like the trial court, we might have awarded only nominal damages, the finding of damages is not a function of this court.

As recently stated in *Sherman v. Seattle,* 57 Wn. (2d) 233, 356 P. (2d) 316 (1960), in reference to a verdict of $74,-900 in an action for personal injuries:

". . . In matters of this nature, we do not feel that we should presume to substitute our judgment for both his [the trial judge's] and the jury's unless this court's sense of justice is shocked by the amount of the award. That is not the situation in this case."

In our opinion, the trial judge in this case did not abuse his discretion in refusing to conditionally reduce the

amount of the verdict or in denying appellants' motion for a new trial.

We have considered appellants' other assignments of error relating to requested instructions and find them to be without merit.

Finding no reversible error in the record, the judgment of the trial court is therefore affirmed.

FINLEY, C. J., OTT, and HUNTER, JJ., concur.

MALLERY, J., dissents.