[No. 5068–8–III.   Division Three.   November 3, 1983.]

BRONZEL DANIEL, *Appellant,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Gerald J. Moberg* and *Ries & Kenison,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Mary Ann Condon, Assistant,* for respondents.

McINTURFF, J.—Bronzel Daniel appeals a jury verdict which rejected his claim for damages resulting from his allegedly false arrest by two Washington state patrolmen. He assigns error to several of the Superior Court's rulings on jury instructions, most notably to the court's decision to take from the jury the question of the lawfulness of his arrest. We hold this decision constituted error and, therefore, reverse the judgment.

At approximately noon on April 12, 1978, Washington State Patrol troopers Michael Fox and Melvin Utterback observed Mr. Daniel sitting in some sagebrush about 50 to 75 feet off the highway which connects Moses Lake and Othello. The previous day, both troopers had been notified of the escape of two black convicts who were armed and dangerous from the Walla Walla State Penitentiary. One of the convicts was described as being 5 feet 6 inches tall, the other as 5 feet 8 inches. Mr. Daniel is a black male, and his height is 6 feet 4 inches. However, the troopers' first observation of Mr. Daniel did not allow them to estimate his height because only his head and shoulders were visible.

Trooper Fox later testified that in his experience, it was unusual for persons to be sitting as far off the roadway

as Mr. Daniel was sitting. He stated that the troopers radioed Ephrata and were read the descriptions of the escapees once again. The two men decided to stop and investigate the possibility that Mr. Daniel might be one of the escapees.

According to Mr. Daniel, one of the troopers got out of the patrol car and told him, "Come here, boy." Mr. Daniel stood, and the trooper started walking toward him. The trooper then drew his gun and asked him if he was an escaped convict. Mr. Daniel responded, "No" and gave his name. He recalls the trooper requesting his identification, but he was "scared to move" for fear it would be interpreted as going for a weapon. At this point, the trooper holstered his gun and asked the second trooper to return to the patrol car for two nightsticks. When the troopers came toward him with the sticks, he stepped back. Mr. Daniel said they then proceeded to attack him, hitting him at least 20 times before handcuffing him and taking him to Moses Lake.

The testimony of the two state troopers varies from Mr. Daniel's testimony. Trooper Utterback states he stood on the shoulder of the road and told Mr. Daniel to stand and proceed toward him. When Mr. Daniel did not respond, Trooper Utterback started walking toward him with his gun drawn, still asking him to stand. This time, Mr. Daniel stood and assumed a "defensive arts position", *i.e.*, his legs were spread apart with one foot slightly ahead of the other and one of his arms was up. At this point, the troopers could see he was not armed, so they holstered their weapons. When Mr. Daniel refused to give his identification, Trooper Fox returned to the patrol car for the nightsticks. The two troopers then approached Mr. Daniel and advised him he was under arrest for obstructing a peace officer by failing to show identification. When he cocked his right hand as if to deliver a blow, Trooper Fox swung at him with his club. Trooper Fox testified that even when Mr. Daniel was in a sitting position, he could tell he was much larger than 5 feet 8 inches, the height of the taller of the

two escapees.

After handcuffing Mr. Daniel, the troopers went through his belongings and discovered his identification card which gave a Moses Lake address. Trooper Utterback transported Mr. Daniel to a clinic for emergency room treatment, then turned him over to the Grant County Sheriff's Office. Mr. Daniel and his mother both testified the effect of the incident was to worsen significantly a previously existing mental condition.

Based on the foregoing events, Mr. Daniel brought this action against the State of Washington and against the state patrol troopers individually for false arrest, false imprisonment, assault and battery, and the negligent and intentional infliction of emotional distress. In this appeal from an adverse jury verdict, he first contends the trial court erred when it refused to instruct the jury on the elements of false arrest, in effect holding as a matter of law that the troopers' arrest of Mr. Daniel was proper. The rule is that unless the evidence conclusively and without contradiction establishes the lawfulness of the arrest, it is a question of fact for the jury to determine whether an arresting officer acted with probable cause. *Coles v. McNamara,* 131 Wash. 377, 384, 230 P. 430 (1924). Here, the trial court stated, "The evidence . . . was clear and . . . reasonable minds could not differ, that the troopers had a reasonable suspicion based upon objective facts that the plaintiff was an escapee."

We agree with the trial court that the troopers initially were justified in making an investigatory stop. The physical characteristics of the escapees matched those of Mr. Daniel with the exception of height. Since only Mr. Daniel's head and shoulders were visible from the highway, the troopers could not have been expected to estimate his height at first. The fact both Mr. Daniel and the escapees are black males was insufficient by itself to justify the stop. However, it was considered by the troopers in conjunction with Mr. Daniel's position 50 to 75 feet off the highway, which they found unusual. *See United States v. Brignoni–Ponce,* 422 U.S.

873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975) (the apparent Mexican ancestry of the occupants of a car does not furnish reasonable grounds to believe they are illegal aliens, but it may be considered along with other relevant factors). The troopers' use of their guns was justified by a reasonable fear for their safety based upon the escapees' description as armed and dangerous. *State v. Williams,* 34 Wn. App. 662, 670, 663 P.2d 1368 (1983); *United States v. Beck,* 598 F.2d 497, 501 (9th Cir. 1979).[1]

While the evidence "conclusively and without contradiction" establishes the validity of the *original* stop, the lawfulness of the troopers' subsequent actions presents a question for the jury. Both Trooper Utterback's and Mr. Daniel's testimony is that Mr. Daniel was in a standing position *before* the trooper asked him for identification. Trooper Fox was unclear on when Mr. Daniel stood, but states that he could tell Mr. Daniel was taller than 5 feet 8 inches as soon as he was able to observe him unobstructed. Both troopers testified that the discrepancy in height did not cause them automatically to eliminate Mr. Daniel as an escapee. To the contrary, Trooper Utterback testified that he did not know how tall the escapees were even though the radio description included height. According to Trooper Fox, radio descriptions may be inaccurate. Therefore, the difference in height did not remove Mr. Daniel from suspicion.

Based on the foregoing testimony, we cannot say conclusively and as a matter of law that the troopers properly

---

[1] It is Mr. Daniel's position that he was under arrest at the moment the troopers approached him with their guns drawn, and that no probable cause existed for that arrest. However, the cases he cites do not support his argument that the use of guns *automatically* turns a valid investigatory stop into an arrest. Rather, their use may be a reasonable component of a stop under circumstances justifying fears for personal safety. *See Beck* and *Williams. State v. Byers,* 88 Wn.2d 1, 559 P.2d 1334 (1977) and *Neff v. United Pac. Ins. Co.,* 58 Wn.2d 618, 364 P.2d 515 (1961), relied upon by Mr. Daniel, are both distinguishable in that they involve situations where suspects accompanied the police to (1) the scene of the crime, or (2) the police station. No physical transportation occurred here until after the arrest for failure to produce identification.

continued their stop of Mr. Daniel. *Coles v. McNamara, supra.* It is for the jury to determine (1) whether the troopers should have withdrawn once they were in a position to observe that Mr. Daniel was much taller than the reported descriptions of the escapees, or (2) whether they acted justifiably in asking for Mr. Daniel's identification and then arresting him when he failed to produce it. Consequently, we hold the trial court erred in taking the question of the propriety of the arrest from the jury. We reverse and remand. On retrial, the court should instruct the jury to determine whether the troopers acted lawfully in proceeding with their questioning of Mr. Daniel.

Second, Mr. Daniel claims the jury instruction based on RCW 9A.76.020, commonly referred to as the "stop and identify" statute, was error. That statute provides:

> Obstructing a public servant. Every person who, (1) without lawful excuse shall refuse or knowingly fail to make or furnish any statement, report, or information lawfully required of him by a public servant, or (2) in any such statement or report shall make any knowingly untrue statement to a public servant, or (3) shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor.

The court gave the following instruction:

> A statute provides:
> Every person who, without lawful excuse shall refuse or knowingly fail to make or furnish any statement, report, or information lawfully required of him by a public servant, or shall knowingly hinder, delay, or obstruct any public servant in the discharge of his official powers or duties; shall be guilty of a misdemeanor.

■ In *State v. White*, 97 Wn.2d 92, 99, 640 P.2d 1061 (1982), decided after Mr. Daniel's trial, the court held RCW 9A.76.020(1) and (2) unconstitutionally void for vagueness because the statute "fails to give fair notice of what activities are required or forbidden and because it encourages arbitrary and erratic stops and arrests." However, the State argues the troopers are protected by a qualified immunity

from liability for false arrest. Washington recognizes such a qualified immunity for police officers acting in good faith on a reasonable belief that a crime has been committed. *Sennett v. Zimmerman,* 50 Wn.2d 649, 651, 314 P.2d 414 (1957). *See also Pierson v. Ray,* 386 U.S. 547, 18 L. Ed. 2d 288, 87 S. Ct. 1213, 1218 (1967). *Hocker v. Woody,* 95 Wn.2d 822, 631 P.2d 372 (1981), relied upon by the State, states a similar immunity for officials from liability under 42 U.S.C. § 1983 for depriving another of his civil rights under color of law.

We hold that the troopers were protected by a qualified immunity with regard to their enforcement of RCW 9A.76-.020. The events in question occurred in 1978, some 4 years *prior* to the decision in *State v. White, supra,* holding the statute unconstitutional. In civil rights actions, the courts have "uniformly refused to award damages when the constitutional right allegedly violated was not clearly established at the time of the conduct." *Hocker v. Woody, supra* at 826. To hold otherwise would place law enforcement officers in the impossible position of responding in damages "every time they miscalculated in regard to what a court of last resort would determine constituted an invasion of constitutional rights". *Hocker,* at 826 (quoting *Bowens v. Knazze,* 237 F. Supp. 826 (N.D. Ill. 1965)). The same rationale applies in false arrest actions, and we adopt it here.

Finally, Mr. Daniel asserts the trial court erred when it refused to instruct the jury on the issue of negligence in the officers' conduct in his arrest. We have reviewed the testimony relied upon by Mr. Daniel in support of his theory of negligent arrest. That testimony describes other types of force arguably available to the officers in making the arrest. Here, the court instructed the jury that a police officer in these circumstances "may use no more force than a reasonably prudent person would use." This instruction allowed the jury to consider Mr. Daniel's argument that the officers acted negligently by using the force they chose to use. Hence, we find no error. *See Kjellman v. Richards,* 82

66

Wn.2d 766, 514 P.2d 134 (1973).

The judgment of the Superior Court is reversed; the case is remanded for a new trial.

GREEN, A.C.J., and EDGERTON, J. Pro Tem., concur.

Reconsideration denied December 20, 1983.