[No. 38244. Department One. March 10, 1966.]

LARRY HARVEY, *Respondent*, v. BERT WIGHT et al., *Appellants.**

*Reported in 412 P.2d 335.

*Guttormsen, Scholfield, Willits & Ager,* for appellants.
*Joseph T. Pemberton,* for respondent.

HILL, J.—This is another host-guest case.

Six teenagers were riding in a car which, while traveling at high speed, failed to negotiate a curve and was wrecked. This is an action on behalf of one of the occupants, for personal injuries sustained by him, against the driver of the car and the parents of the driver of the car who were the owners of the car. A verdict of $25,000 was reduced by certain stipulated damages, which had already been paid, to $24,201.35, and a judgment entered in that amount.

Aside from a claim that the damages were excessive and should be reduced, or a new trial granted, the only errors assigned are to instructions given or refused relating to gross negligence.

The case was tried prior to our recent decisions in *Nist, Dole,* and *Hansen,*[1] which appear to give the answer to most of the questions raised by the defendants' assignments of error.

One claimed error relating to instructions remains for consideration. The phrasing of the last sentence in instruction No. 7, to which the defendants assigned error, is not to be commended, but when that instruction is read with the other instructions given, it seems to us that it could not possibly have been prejudicial. It reads as follows:

> A violation, if you find there was such a violation, of a statute governing the operation of a motor vehicle is negligence as a matter of law.

> While the violation of a positive statute is negligence, such negligence will not render a defendant liable for

---

[1] *Nist v. Tudor,* 67 Wn.2d 322, 407 P.2d 798 (1965); *Dole v. Goebel,* 67 Wn.2d 337, 407 P.2d 807 (1965); *Hansen v. Pauley,* 67 Wn.2d 345, 407 P.2d 811 (1965).

damages unless such violation proximately contributed to or proximately caused the injury.

The foregoing instruction instruction Number 6 and the preceding portion of this Instruction Number 7 as to the ordinary standard of care required in the operation of a motor vehicle are given for the purpose of defining negligence in its usual meaning.

In this case the parties bear a special legal relationship to each other. The plaintiff was a guest in the car owned and operated by the defendants, who were the plaintiff's hosts. This relationship is defined by law and it is referred to as the host-guest relationship. The pertinent portions of this law in the State of Washington are as follows:

"No person transported by the owner or operator of a motor vehicle as an invited guest . . ., without payment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless the accident was . . . the result of said owner's or operator's gross negligence . . . , and unless the proof of the cause of action is corroborated by competent evidence or testimony independent of, or in addition to, the testimony of the parties to the action . . ."[2]

Whether or not a violation of a statute can be determined to be gross negligence is a question for you as jurors to decide. (Instruction No. 7)

In instruction No. 3 "gross negligence" was defined as the failure to exercise slight care. In instruction No. 5 the definition of the duty of a person driving an automobile upon the public highways of this state was given in the words of the statute.[3] In instruction No. 6, ordinary negligence was defined.

In instruction No. 7, the jury was told that if there was a violation of that statute, it constituted negligence as a matter of law; that negligence does not render a person liable for damages unless such negligence was a proximate cause of the injury sustained. Then, as suggested in the *Nist, Dole,* and *Hansen* cases, it was explained that negligence had been defined in the preceding instruction (6) and in the first two paragraphs of instruction No. 7 to clar-

---

[2]The host-guest statute, RCW 46.08.080.
[3]RCW 46.48.010.

ify the distinction between "negligence" in its usual meaning and the "gross negligence" which a guest in a motor vehicle accident must establish to recover from his host; and then, in the final sentence, told the jury that they must determine whether a violation of the statute, which they had previously been told would be negligence, was also gross negligence.

Instruction No. 8 again told the jury that there could be no recovery by a guest in an automobile unless there was gross negligence by the host, as previously defined.

We will concede that the last sentence in instruction No. 7 might better have been phrased to say: that whether or not the conduct of the host-driver, which you may find constitutes a violation of the statute quoted to you in instruction No. 5, also constitutes gross negligence is for you to determine. However, there can be no question that the jury had to find gross negligence (which was properly defined) before they could bring in a verdict for the injured guest.

The final assignment of error relates to the excessiveness of the $25,000 verdict.

The doctor who performed the necessary surgery testified:

> The findings were essentially the laceration, abrasions that we previously described, and this was explored beneath the cut at this time, and we found that there was a tear in the dense sort of an envelope that encases the skull, the outside surface of the skull, called the galea aponeurosis. This was actually cut, and beneath this dense tissue was what we refer to as the stellate, or star-like, depressed skull fracture, as evidenced by our x-rays.

> We further had to inspect the covering of the brain itself, which is, of course, called the dura mater, which is another very dense envelope of brain covering, and there seemed to be a very small tear in the dura, and this was based on the fact that there was in the field some fluid which had the characteristics of cerebral spinal fluid. And this hole was not identified at the surgery, because the curved nature of the front of the brain prohibited us from exposing this, and due to the technical problems involved, it is not necessary to expose it, and, in fact, it

can be harmful to expose it. Therefore, it was interpreted as a small dural tear. And then the bone which was pressed against the front part of the brain, the frontal lobe, was removed, or elevated, we call it an elevation of a depressed skull fracture.

The ophthalmologist, who first examined the plaintiff when he arrived at the hospital and later helped with the surgery and treated the plaintiff for his eye injury, testified:

Well, I found this young man and three other young people on stretchers; they had been in an auto accident.

No alcohol detected on any of them. The right frontal area has a large laceration about four centimeters in length, and this area is depressed, indicating a probable skull fracture. He was semicomatose, very pale, and the right eye was considerably proptosed, that is, the eye was pushed out, and the lid could only be opened with difficulty. The globe itself appeared undamaged and the extraocular movements were normal. . . . I next saw him at 11:00 o'clock the same day in the operating room at St. Luke's Hospital. Dr. Rinne called me there to help him with the eye portion of the surgery which he was doing. He had opened this scalp wound, found three depressed bones, lateral to the frontal sinus, over in here (indicating) and found a laceration of the dura, which is the covering of the brain. He was able by aid of rongeures to elevate the fragments of the bone, and then he closed the periosteum and skin and inserted a drain. . . . I saw him the next time on November 29th in the hospital. There was still marked proptosis; that is, the right eye was still out quite a bit. He next was seen December second in the hospital. His eye lids were now open but he had double vision. He was next seen the following day, and there was a mass palpable in the upper part of the orbit, which was unabsorbed blood. In other words, it was a blood clot, or hematoma.

Fortunately, there were apparently no permanent disabilities and no loss of earning capacity. Total special damages were $798.65, which included all medical and hospital expenses. The accident was November 25, 1961, and the last medical treatment was April 12, 1962. The ophthalmologist testified that there was no residual injury, except

a very slight and hardly noticeable droop to the right eyelid. The plaintiff complained only of difficulty in sighting a rifle or in looking "at something real close," with sometimes a burning sensation in the scars on his forehead.

The amount of more than $24,000, with such slight apparent residual damage, seems large. However, there is no claim or indication of passion and prejudice in connection with the verdict.

The trial judge refused to grant a new trial or to reduce the verdict, and we do not feel that "we should presume to substitute our judgment for both his [the trial judge's] and the jury's unless this court's sense of justice is shocked by the amount of the award." *Sherman v. Seattle*, 57 Wn.2d 233, 248, 356 P.2d 316 (1960). The award does not shock[4] the court's sense of justice.

The judgment is affirmed.

ROSELLINI, C. J., OTT, HUNTER, and HALE, JJ., concur.

---

May 31, 1966. Petition for rehearing denied.

---

[4]It is only fair to note that it may "shake" some of us, but it does not "shock" us.