[No. 327-3.    Division Three.    June 12, 1972.]

CHARLENE CURTISS, *Respondent,* v. YOUNG MEN'S CHRISTIAN ASSOCIATION, *Defendant,* PREMIER ATHLETIC PRODUCTS CORPORATION, *Appellant.*

*John Gavin* and *Robert R. Redman* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for appellant.

*Theodore D. Peterson* and *Robert S. Day* (of *Peterson, Taylor & Day*), for respondent.

GREEN, J.—Plaintiff, Charlene Curtiss, brought this action against defendants, Premier Athletic Products Corporation, hereafter called "Premier", and the Young Men's Christian Association of the Lower Columbia Basin, hereafter called the "YMCA", to recover damages for severe

and permanent personal injuries suffered by her at the YMCA when the high bar of a set of parallel bars collapsed during use. At the conclusion of the evidence, the trial court dismissed the YMCA and directed the jury to return a verdict against Premier. A verdict was returned for $100,000, consisting of medical expenses in the sum of $15,140.20, $25,000 for future expenses and $59,859.80 general damages. Thereafter, the trial court granted plaintiff's motion for a new trial on damages only, stating in essence the award of general damages was grossly inadequate. Defendant Premier appeals from this order. No appeal was taken from the dismissal of the YMCA.

Two basic questions are presented: (1) Did the trial court err in granting a new trial? and if not, (2) Was it error to direct a verdict against Premier? We answer both in the negative.

In granting plaintiff's motion for new trial, the trial judge said the verdict for general damages was so grossly inadequate as to "shock", "stun", and "shatter" him, causing him to believe that substantial justice had not been done. He concluded his oral opinion, saying:

> Now, here in the future and in the past she has suffered so much, just unbelievably it seems to me . . . and her life has been so completely devastated in so many ways, and to say that this—and I am interpreting this in terms of Dr. Silverman's testimony and the most conservative testimony available here, that this girl is a paraplegic. The fact she is paralyzed which really in some respects is the minor part of her injuries this matter of incontinence, she can't go to school, she can't go to work without danger of incontinence which is terribly embarrassing actually and limits her activities and things she might take part in. In addition to that she has disability with respect to control of her bowels and all of the little personal items that one who had not heard this evidence would never dream were involved in a disability of this nature.
>
> Frankly, I can't imagine the theory upon which this amount was arrived at. It just simply stunned me at the time. It stuns me now. I simply do not believe that the

human life is to be placed on this meager scale financially.

█ The granting of plaintiff's motion for new trial because of inadequate damages must be viewed in light of the evidence most favorable to Premier. This evidence discloses that at the time of her injuries plaintiff was 17 years of age, was well coordinated, had earned a number of honors in gymnastics and had a life expectancy of 51.28 years. On the evening of June 9, 1968, she was attending a class in gymnastics at and under supervision of the YMCA. The gymnastics were performed on a set of parallel bars placed in what is called an uneven position, with one bar higher than the other. After warming up, plaintiff took hold of the highest of the uneven bars with both hands, intending to swing around the upper bar and onto the lower bar in a maneuver called a "sole circle." While she was engaged in this maneuver, the top bar separated from the metal saddles at each end to which the bar was affixed, and she fell 5 to 7 feet, landing on her back in a jack-knife position, half on and half off the mat.

As a result of this fall, plaintiff sustained a fracture dislocation at the 12th thoracic level (the mid-portion of the back), causing severe pressure on the spinal cord accompanied by excruciating pain and paralysis in her legs. A laminectomy was performed that night to relieve the pressure and 2 months later the vertebrae were fused to prevent further movement. Four months after the injury she was allowed to be up with a back brace. She received physical therapy and eventually learned to walk with crutches, wearing special boots to support her ankles. Later she received a set of short leg braces that helped stabilize her ankles.

In the summer of 1969, plaintiff underwent a 3-week evaluation in the Department of Physical Medicine and Rehabilitation at the University of Washington. On September 30, 1970, she was examined on behalf of defendant by Dr. Donald Silverman, Director of the Department of Rehabilitation Medicine at Providence Hospital in Seattle,

who had reviewed the reports of examination at the University of Washington. He found that, although plaintiff had control of some of the muscles in both legs allowing her to keep her knees from buckling when standing and permitting her to swing both legs forward to back, she was an incurable paraplegic. He also found that because of only partial damage to the spinal cord, she has complete sensation in her right leg but suffers from a lack of sensation or feeling from the knee down in the front of her left leg and from the thigh down in the back of her left leg. There is no feeling or sensation in either foot.

These conditions give rise to numerous problems noted by Dr. Silverman in his testimony: (1) She has no control over bowel movements and must use suppositories daily. This condition is permanent. (2) She suffers from incontinence of her bladder, requiring her to wear perineal pants and sanitary napkins all the time. When she voids she excuses herself and goes to change her clothes. Dr. Silverman suggested, as an alternative, that she use a catheter connected to a bag that could be strapped to the inside of her thigh to collect urine for a 4 to 5-hour period, thus allowing her to stay dry. However, plaintiff chose the other method because of several bladder infections caused by the use of a catheter while hospitalized. This condition is permanent and renders her more susceptible to infection. (3) Serious skin problems are present, resulting from the loss of feeling or protective sensation on the bottom of her feet. When Dr. Silverman saw the plaintiff, her feet were in very bad condition. The left foot had been burned on the outer side. Plaintiff thought this occurred while she was riding in a truck when the heat from the engine was transmitted through the floor to her foot. This burn had healed. There were other healed scars reflecting prior ulcerations on the ball of the left foot. There were blisters present, together with minor ulcerations, on a line along the rim of the left foot where the top of the shoe had touched the foot. Plaintiff's right foot showed a deep ulceration, with pus and oozing of tissue fluid, on the bottom of the big toe. It

was surrounded by necrotic (dead) tissue. There was another ulceration over the right heel cord and on the left heel, with pus draining therefrom. Both feet were markedly swollen with a clear fluid oozing from the open areas. Her legs were swollen due to lack of circulation. Dr. Silverman suggested that she wear elastic stockings to support the muscles in her legs and improve the circulation. He noted these stockings were not very cosmetic. Dr. Silverman stated plaintiff would be committed to a wheelchair if she loses her ability to walk. Although Dr. Silverman disagreed, one of plaintiff's doctors predicted she would have 10 surgical operations—one every 2 years—and gradually her legs would require amputation. (4) Dr. Silverman noted that plaintiff does not have normal heel-toe gait, *i.e.*, where the heel first strikes the ground and then the toe quietly comes down. As a result of the injury, plaintiff's ankles have contractures so that instead of standing in an upright position with her foot and ankle at a 90-degree angle, a tightness in the back of the ankle and a shortening of the heel cord causes plaintiff's feet to point downward about 30 degrees. As a result, when plaintiff walks the weight falls on her toe and forefoot much like women who wear high heels. The difference is that plaintiff does not have a protective sensation to warn her of sore feet so that she can take off her shoes. Further, she cannot take off her shoes and still walk because she needs the brace attached to the shoe in order to walk. Also, there is a deformity in both ankles that causes the foot to turn outward, and as a result she tends to bear her weight on the inner edge of her foot. By reason thereof, she must align her body segments by leaning forward slightly to keep from collapsing at the knee and hips because of her partial paralysis. Unless this condition can be corrected, it is very likely that in the future plaintiff will have to wear long leg braces due to the strain on the ligaments at the knee. These conditions aggravate her skin problems. She also has a genetic condition of bunions and out-turned large toes which did not result from the accident, but contributes to the difficulty of man-

agement of the skin on her feet. (5) Plaintiff has an angulation at the point of fracture (hunchback) which is not visible through her clothing and requires no medical attention.

Dr. Silverman proposed that a series of operations be performed to correct the deformity that appears in her ankles and feet. He testified that in his opinion her feet could be straightened out, that it was probable this would prevent future breakdowns of the skin on the feet and that it is possible plaintiff might be able to walk without braces. This opinion contradicted other doctors who predicted continued deterioration resulting in eventual amputation of the legs.

At the time of trial plaintiff was attending Eastern Washington State College where she was taking less than a full class load and achieving a 3.6 grade-point average. Plaintiff testified that when she has a 7:40 a.m. class she arises at 6 a.m. because it takes considerable time to get ready. On arising, there are times when her feet are swollen and bloody and when she goes to the bathroom a trail of blood will be left on the floor, marking her path. Difficulty is encountered in getting around the campus and climbing stairs to classrooms.

The evidence reflects that plaintiff could marry, engage in sexual intercourse in a passive way and bear children. However, in her present condition she would be unable to hold a child or perform housework except while in a wheelchair, as she must use forearm crutches to move about.

Dr. Silverman testified that plaintiff has adjusted psychologically and accepted her condition so that she is a stable, well-integrated person. However, her mother testified to the contrary, stating that plaintiff is depressed from time to time and unable to accept her condition. There is other testimony that paraplegics, as the years go by, are subject to a variety of psychiatric problems that sometimes lead to suicide.

It is evident that plaintiff was an energetic, outgoing, athletic young girl before the injury. Her present condition

prevents her participation in activities within her field of interest. She is a prisoner of her paraplegia. It is obvious her lifelong pursuits are extremely limited by her physical condition.

During oral argument, this court viewed movies of plaintiff walking and ministering to her personal needs. These movies, along with slides of the condition of her feet, confirm the factual description outlined above. The trial judge had the opportunity to see the plaintiff, hear the witnesses, observe their demeanor and was shocked, stunned and shattered by the award of only $59,859.80 general damages. It likewise shocks the conscience and sound judgment of this court.

■ Although the trial court expressed the opinion the inadequacy of the verdict resulted from passion and prejudice,[1] we are unable to find any significant evidence to support that conclusion. In such circumstance, the test to be used is whether the verdict shocks the conscience, sense of justice and sound judgment of the appellate court. In holding that a verdict of $130,000 for the total loss of eyesight in one eye did not shock the conscience of the court, the court said in *Hogenson v. Service Armament Co.*, 77 Wn.2d 209, 218, 461 P.2d 311 (1969):

> It is very difficult to assess in monetary terms the damage caused by the functional loss of one eye. We are convinced, however, that the amount here involved is not an unrealistic appraisal of the damages sustained. Since there was no significant evidence indicating that passion and prejudice played any part in the jury's determina-

---

[1]The court expressed the opinion the verdict was the result of passion and prejudice arising from (1) the jocularity of one of plaintiff's medical witnesses, engendering in the jury an observed strong feeling of disfavor; (2) the description by plaintiff's counsel of the difficulties plaintiff will encounter in sexual intercourse, due to her physical condition, although legitimate argument, was observed to have been highly distasteful to the jury; and (3) testimony by a physician that plaintiff was being helped by the rehabilitation department of the state, although stricken, did not unring the inference that she was receiving financial help from the state. The trial judge observed that while he found it difficult to believe the jury would hold items (1) and (2) against plaintiff, he believed they did so.

tion, *the test to be used is the conscience of the appellate court.* In assessing this factor, it is of some interest to look at comparative judgments which have been appealed in other states. In recent years verdicts have been upheld which are comparable to the one here in question. *See, e.g., Martinez v. Moore,* 221 Cal. App. 2d 516, 34 Cal. Rptr. 606 (1963) ($150,000 for loss of one eye); *Rivers v. Leitman,* 317 F.2d 102 (4th Cir. 1963) ($140,000 for loss of one eye); *Kavanagh v. Butorac,* 221 N.E.2d 824, (Ind. App. 1966) ($100,000 for loss of one eye and psychological trauma).

The amount of the verdict is further substantiated by the record of this case. Neither the record nor the size of the award indicates that the jury was influenced by any of the allegedly prejudicial argument and comment. It does not shock our sense of justice and sound judgment.

(Italics ours.) As observed in *Hogenson,* it is of interest to look at comparative judgments which have been appealed in other states. In recent years, verdicts for injuries comparable to plaintiff's have greatly exceeded the one in the instant case and were held nonexcessive. *Lebrecht v. Bethlehem Steel Corp.,* 402 F.2d 585 (2d Cir. 1968) ($590,000 for spinal injuries with partial paralysis at age 28); *Sloma v. Pfluger,* 125 Ill. App. 2d 347, 261 N.E.2d 323 (1970) ($380,000 for 100 per cent loss of function of right arm, 50 per cent impairment of function of left arm, and 10 per cent impairment of legs); *Stephenson v. Air Prods. & Chemicals, Inc.,* 114 Ill. App. 2d 124, 252 N.E.2d 366 (1969) ($300,000 for injury to neck, shoulders, back, limitation in bending, loss of left ankle reflex, headaches and various pains in limbs making plaintiff unable to carry heavy objects, climb or walk on uneven surfaces); *Florida Power & Light Co. v. Robinson,* 68 So.2d 406 (Fla. 1953) ($225,360 for spinal injuries with bladder and bowel incontinence). *Cf. Jehl v. Southern Pac. Co.,* 66 Cal. 2d 821, 427 P.2d 988, 59 Cal. Rptr. 276 (1967) (a verdict for $100,000 was held inadequate for an amputated leg below the right knee and chronic osteomyelitis in the left leg). These cases involved not only the issue of damages, but also contested issues of liability.

In the instant case, the court instructed that defendant was liable; hence, the verdict was unaffected by the issue of liability. It is inconceivable to this court that a jury could award only $59,859.80 in general damages to cover pain and suffering, restricted future activity with impairment of earning capacity, and the myriad of other ways this plaintiff is affected for the rest of her life for what the trial judge termed an "horrendous" injury. *Cf. Hogenson v. Service Armament Co., supra; Fosbre v. State,* 70 Wn.2d 578, 424 P.2d 901 (1967); *O'Dell v. Chicago, M., St. P. & Pac. R.R.,* 6 Wn. App. 817, 496 P.2d 519 (1972); *Harvey v. Wight,* 68 Wn.2d 205, 412 P.2d 335 (1966); *Johnson v. Marshall Field & Co.,* 78 Wn.2d 609, 478 P.2d 735 (1970). The trial court's order granting a new trial for inadequacy of damages is affirmed.

■ The next question is whether the new trial should be limited to damages only. The trial court directed a verdict against Premier based upon *Pulley v. Pacific Coca-Cola Bottling Co.,* 68 Wn.2d 778, 415 P.2d 636 (1966).

Our review of the evidence confirms the trial court's conclusion. Plaintiff established beyond question the defective condition of the bar. The practical effect of *Pulley* is to impose upon Premier the burden of showing who caused the defect. This Premier failed to do.

Premier contends that *Pulley* is not applicable because it was a breach of warranty case; whereas, the instant case is one based upon strict liability. Therefore, it is contended that Justice Neill's concurring opinion in *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 535, 452 P.2d 729 (1969), is applicable and that plaintiff had the burden of proving the defect existed when the bar left the factory. However, the majority opinion in *Ulmer* did not reject *Pulley* but relied upon it, among other cases, in adopting the doctrine of strict liability against manufacturers. Even if the rule contended for by Justice Neill in *Ulmer* applied, we believe the plaintiff sustained her burden since there is no evidence that anyone other than Premier assembled the saddles to the bar in question.

The order granting a new trial is affirmed.

MUNSON, C.J., and EVANS, J., concur.

Petition for rehearing denied July 31, 1972. (See 7 Wn. App. 451.)

Review granted by Supreme Court September 20, 1972.