[No. 42523. En Banc. July 12, 1973.]

CHARLENE CURTISS, *Respondent*, v. YOUNG MEN'S CHRISTIAN ASSOCIATION OF THE LOWER COLUMBIA BASIN, *Defendant*, PREMIER ATHLETIC PRODUCTS CORPORATION, *Petitioner*.

*Gavin, Robinson, Kendrick, Redman & Mays, John Gavin, Robert R. Redman,* and *Michael W. Leavitt,* for petitioner.

*Theodore D. Peterson* and *Robert S. Day* (of *Peterson, Taylor & Day*), for respondent.

HUNTER, J.—This is a review of the decision of the Court of Appeals (*Curtiss v. YMCA,* 7 Wn. App. 98, 498 P.2d 330 (1972)), affirming the trial court's order in a personal injury action.

The record discloses that the plaintiff (respondent), Charlene Curtiss, was injured while attending a gymnastics class at and under the supervision of the YMCA. While she was engaging in a maneuver called a "sole circle" the top bar of a set of parallel bars separated from its metal saddles at each end of the bar and the plaintiff fell 5 to 7 feet,

landing on her back in a jackknife position, half on and half off the mat. The record also discloses that this was one of the first times the set of parallel bars was used for the "sole circle" maneuver with one of the bars higher than the other.

The plaintiff instituted this action against the defendants, Young Men's Christian Association of the Lower Columbia Basin and Premier Athletic Products Corporation (petitioner), hereinafter referred to as the defendant, to recover for the severe permanent personal injuries she suffered as the result of the fall. At the conclusion of all the evidence, the trial court dismissed the Young Men's Christian Association of the Lower Columbia Basin, and directed the jury to return a verdict against the defendant. The jury returned a verdict of $100,000, consisting of medical expenses in the sum of $15,140.20, $25,000 for future expenses, and $59,859.80 for general damages. Thereafter, the trial court granted the plaintiff's motion for a new trial on the issue of damages only, stating that the verdict was grossly inadequate, the result of passion and prejudice, and that substantial justice had not been done.

The defendant appealed from the trial court's order. The Court of Appeals affirmed the trial court's judgment and order, stating the jury's verdict shocked the conscience of the court. In affirming the judgment of the trial court, the Court of Appeals also indicated that in a strict liability case of this nature, the burden of proof is upon the defendant manufacturer to show who caused the defect. From the Court of Appeals' decision, the defendant petitioned this court for review, which we granted.

The record indicates that the plaintiff, who was only 17 years old at the time of the accident, sustained extensive and extreme permanent injuries. The Court of Appeals' exhaustive review of the evidence in regard to her injuries which is supported in the record, and which we adopt, is set out as follows:

"As a result of this fall, plaintiff sustained a fracture dislocation at the 12th thoracic level (the mid-portion of

the back), causing severe pressure on the spinal cord accompanied by excruciating pain and paralysis in her legs. A laminectomy was performed that night to relieve the pressure and 2 months later the vertebrae were fused to prevent further movement. Four months after the injury she was allowed to be up with a back brace. She received physical therapy and eventually learned to walk with crutches, wearing special boots to support her ankles. Later she received a set of short leg braces that helped stabilize her ankles.

"In the summer of 1969, plaintiff underwent a 3-week evaluation in the Department of Physical Medicine and Rehabilitation at the University of Washington. On September 30, 1970, she was examined on behalf of defendant by Dr. Donald Silverman, Director of the Department of Rehabilitation Medicine at Providence Hospital in Seattle, who had reviewed the reports of examination at the University of Washington. He found that, although plaintiff had control of some of the muscles in both legs allowing her to keep her knees from buckling when standing and permitting her to swing both legs forward to back, she was an incurable paraplegic. He also found that because of only partial damage to the spinal cord, she has complete sensation in her right leg but suffers from a lack of sensation or feeling from the knee down in the front of her left leg and from the thigh down in the back of her left leg. There is no feeling or sensation in either foot.

"These conditions give rise to numerous problems noted by Dr. Silverman in his testimony: (1) She has no control over bowel movements and must use suppositories daily. This condition is permanent. (2) She suffers from incontinence of her bladder, requiring her to wear perineal pants and sanitary napkins all the time. When she voids she excuses herself and goes to change her clothes. Dr. Silverman suggested, as an alternative, that she use a catheter connected to a bag that could be strapped to the inside of her thigh to collect urine for a 4-to 5-hour period, thus allowing her to stay dry. However, plaintiff chose the other method

because of several bladder infections caused by the use of a catheter while hospitalized. This condition is permanent and renders her more susceptible to infection. (3) Serious skin problems are present, resulting from the loss of feeling or protective sensation on the bottom of her feet. When Dr. Silverman saw the plaintiff, her feet were in very bad condition. The left foot had been burned on the outer side. Plaintiff thought this occurred while she was riding in a truck when the heat from the engine was transmitted through the floor to her foot. This burn had healed. There were other healed scars reflecting prior ulcerations on the ball of the left foot. There were blisters present, together with minor ulcerations, on a line along the rim of the left foot where the top of the shoe had touched the foot. Plaintiff's right foot showed a deep ulceration, with pus and oozing of tissue fluid, on the bottom of the big toe. It was surrounded by necrotic (dead) tissue. There was another ulceration over the right heel cord and on the left heel, with pus draining therefrom. Both feet were markedly swollen with a clear fluid oozing from the open areas. Her legs were swollen due to lack of circulation. Dr. Silverman suggested that she wear elastic stockings to support the muscles in her legs and improve the circulation. He noted these stockings were not very cosmetic. Dr. Silverman stated plaintiff would be committed to a wheelchair if she loses her ability to walk. Although Dr. Silverman disagreed, one of plaintiff's doctors predicted she would have 10 surgical operations—one every 2 years—and gradually her legs would require amputation. (4) Dr. Silverman noted that plaintiff does not have normal heel-toe gait, *i.e.*, where the heel first strikes the ground and then the toe quietly comes down. As a result of the injury, plaintiff's ankles have contractures so that instead of standing in an upright position with her foot and ankle at a 90-degree angle, a tightness in the back of the ankle and a shortening of the heel cord causes plaintiff's feet to point downward about 30 degrees. As a result, when plaintiff walks the weight falls on her toe and forefoot much like women who wear high

heels. The difference is that plaintiff does not have a protective sensation to warn her of sore feet so that she can take off her shoes. Further, she cannot take off her shoes and still walk because she needs the brace attached to the shoe in order to walk. Also, there is a deformity in both ankles that causes the foot to turn outward, and as a result she tends to bear her weight on the inner edge of her foot. By reason thereof, she must align her body segments by leaning forward slightly to keep from collapsing at the knee and hips because of her partial paralysis. Unless this condition can be corrected, it is very likely that in the future plaintiff will have to wear long leg braces due to the strain on the ligaments at the knee. These conditions aggravate her skin problems. She also has a genetic condition of bunions and out-turned large toes which did not result from the accident, but contributes to the difficulty of management of the skin on her feet. (5) Plaintiff has an angulation at the point of fracture (hunchback) which is not visible through her clothing and requires no medical attention.

"Dr. Silverman proposed that a series of operations be performed to correct the deformity that appears in her ankles and feet. He testified that in his opinion her feet could be straightened out, that it was probable this would prevent future breakdowns of the skin on the feet and that it is possible plaintiff might be able to walk without braces. This opinion contradicted other doctors who predicted continued deterioration resulting in eventual amputation of the legs.

"At the time of trial plaintiff was attending Eastern Washington State College where she was taking less than a full class load and achieving a 3.6 grade-point average. Plaintiff testified that when she has a 7:40 a.m. class she arises at 6 a.m. because it takes considerable time to get ready. On arising, there are times when her feet are swollen and bloody and when she goes to the bathroom a trail of blood will be left on the floor, marking her path. Diffi-

culty is encountered in getting around the campus and climbing stairs to classrooms.

"The evidence reflects that plaintiff could marry, engage in sexual intercourse in a passive way and bear children. However, in her present condition she would be unable to hold a child or perform housework except while in a wheelchair, as she must use forearm crutches to move about.

"Dr. Silverman testified that plaintiff has adjusted psychologically and accepted her condition so that she is a stable, well-integrated person. However, her mother testified to the contrary, stating that plaintiff is depressed from time to time and unable to accept her condition. There is other testimony that paraplegics, as the years go by, are subject to a variety of psychiatric problems that sometimes lead to suicide.

"It is evident that plaintiff was an energetic, outgoing, athletic young girl before the injury. Her present condition prevents her participation in activities within her field of interest. She is a prisoner of her paraplegia. It is obvious her lifelong pursuits are extremely limited by her physical condition." *Curtiss v. YMCA*, 7 Wn. App. 98, 100, 498 P.2d 330 (1972).

During oral argument, we viewed moving pictures and slides of the plaintiff walking and ministering to her personal needs. These pictures further confirm the factual description of the Court of Appeals.

The trial court based its determination of the jury's prejudice against the plaintiff on certain incidents that occurred at the trial and the introduction of certain evidence, all of which it believed affected the amount of the verdict. The trial court indicated in its oral opinion that passion and prejudice in the instant case arose from the following, and respectively stated its conclusions: (1) Considerable jocularity of one of the plaintiff's medical witnesses. The trial judge felt that this jocularity engendered in the jury a very strong feeling of disfavor. (2) The argument by the plaintiff's counsel involving conditions under which sexual in-

tercourse would have to be carried on by the plaintiff. In observing the jury during this argument the trial judge felt that the jury took a very antagonistic view of this discussion. (3) The testimony of Dr. Silverman on two different occasions that the plaintiff was being helped by the rehabilitation department of the state. The trial court stated, even though both statements were objected to and the objections sustained, "you don't unring bells."

The trial court further stated it was shocked, stunned and shattered by the amount of the verdict in view of the extensive and extreme permanent injuries sustained by the plaintiff, which reflected its conviction that there was no doubt the verdict was a result of passion and prejudice of the jury resulting from the above incidents observed by the trial court and the evidence considered by the jury. The trial court complied with CR 59 (a) (5) and (f).

█ It is well established in this jurisdiction that where the issue before the trial court does not involve a purely legal question, but arises from a controverted question of fact, the granting of a new trial is so largely a matter of discretion with the trial court that its ruling thereon will not be disturbed upon appeal except for manifest abuse of such discretion.

*Barefield v. Barefield*, 69 Wn.2d 158, 164, 417 P.2d 608 (1966), and cases cited therein.

In view of the extensive and extreme injuries sustained by the plaintiff and the award of $59,859.80 in general damages to cover pain and suffering, restricted future activity, impairment of earning capacity, and the numerous other ways the plaintiff will be affected for the rest of her life, we cannot say as a matter of law that the trial court, in determining that the verdict reflected passion and prejudice, abused its discretion in granting a new trial on the issue of damages. *Hills v. King*, 66 Wn.2d 738, 404 P.2d 997 (1965), and cases cited therein.

The defendant contends, however, in any event that the trial court erred in granting a new trial on the issue of damages only, in that the record did not support the trial

court granting the plaintiff's motion for a directed verdict in its instructions to the jury on the issue of liability. We disagree.

■ The defendant argues that the trial court erred in ruling the burden of proof in a strict liability case of this nature is upon the manufacturer, once the plaintiff asserts that she was injured by a defect in the manufacturer's product, to show that the product was not defective. We agree with the defendant. We construe our holding in *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969), to be that the burden of proof is upon the plaintiff to show that the product was in a defective condition when it left the manufacturers. In that case the plaintiff, who was injured in an automobile accident, contended that it was only necessary for her to establish that the automobile, as manufactured by the defendant, was dangerously defective and that the accident in which she was injured was attributable to the defect in the automobile, in order to prevail in her suit. We agreed with the plaintiff and, by doing so, we adopted the language in the Restatement (Second) of Torts § 402A, comment *g* at 351 (1965), which was more specifically discussed in the concurring opinion, and provides:

> The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff . . .

We are satisfied, however, that even though the trial court did err in determining where the burden of proof lies, the defendant is not entitled to a reversal of the trial court's judgment on the directed verdict.

The record shows that the cause of the accident in the instant case was that the high bar was improperly fastened to the saddle which supports it and holds it in place. On either end of the bar there were eight screw holes. The screws which hold the bar on the saddle were not in the holes originally intended for their reception, but were worked into four holes close to the original holes. The force of the plaintiff's body was too much for the improperly

fastened bar and caused the screws to work themselves loose allowing the bar to pull away from the saddles intended to keep the bar in place. There can be no question of the inherent defective and dangerous condition of the apparatus at the time of the plaintiff's injury.

The singular question in regard to liability then is whether the record sustains a determination that the apparatus was in the same inherently dangerous and defective condition at the time it left the defendant's plant as at the time the plaintiff sustained her injuries by reason of the separation of the acrobatic bar.

The uncontradicted direct testimony of the YMCA supervisor shows that there was no change in the saddle assembly between the time of delivery and the time of the accident. The parallel bars were in the custody of Mr. Bare, the supervisor, from the time of delivery to the date of the accident. He testified that he unpacked the assembly and that he did not change the basic saddle assembly. The record shows that the bars are assembled to the saddles at the manufacturers.

The question remaining as to liability then is whether there is sufficient evidence in the record to overturn the plaintiff's evidence. Mr. Ross, the president of the defendant, indicated that he was familiar with all phases of the defendant's operations and that all the bars they built were built according to NCAA specifications. Then on recross-examination, after measuring the bars involved in the accident, he admitted that the set of bars in question did not meet NCAA specifications. Mr. Ross also admitted that the bars in question could possibly be an experimental model. And, he admitted that it was possible, not probable, that these particular bars went out of the factory with the additional set of holes in them.

The record also indicates that two workmen, whose duty it was to affix the saddles to the apparatus, testified that neither of them had sent out a bar in the condition of the one in question nor drilled holes like the extra set of holes in

this particular bar. However, neither of them recalled this particular shipment and neither of them could say that they examined every bar that was shipped out of the plant.

We recited the established rule in this state in *Holdcroft v. Hahn Truck Co.*, 71 Wn.2d 410, 429 P.2d 204 (1967), that a motion for a directed verdict

> admits the truth of the opponent's evidence, together with all reasonable inferences arising therefrom, and requires a most favorable interpretation thereof. No element of discretion is involved, and such motions can be granted only when the court can say, as a matter of law, there is no substantial evidence to support the opponent's claim.

Giving testimony of the defendant the most favorable inferences, there is still the possibility the bar in question was an experimental bar. The totality of the defendant's evidence then is speculative as to the condition of this particular bar at the time it left the manufacturer's plant. A verdict cannot be based on mere theory or speculation. *Kilmer v. Bean*, 48 Wn.2d 848, 296 P.2d 992 (1956). The plaintiff was entitled to a directed verdict on the issue of liability, since the defendant failed to present substantial evidence which would support a jury verdict in his favor. *Wold v. Jones*, 60 Wn.2d 327, 373 P.2d 805 (1962), and cases cited therein.

It is well established in this jurisdiction that the trial court's judgment will be affirmed if the result reached is supported by any legal reason within the pleadings, the facts and the applicable law. *Vacca v. Steer, Inc.*, 73 Wn.2d 892, 441 P.2d 523 (1968); *Kirkland v. Steen*, 68 Wn.2d 804, 416 P.2d 80 (1966), and cases cited therein. Therefore, even though the trial court erred in its ruling on the burden of proof, the record, nevertheless, sustains its judgment in granting a directed verdict on the issue of liability.

The defendant also contends that the trial court erred in refusing to permit Mr. Ross to testify as to what a party might do in the event difficulties were encountered in the assembly and adjustment of the bars if they did not assem-

ble them in accordance with the instructions. We disagree.

■ The offered testimony of Mr. Ross was purely speculative in nature. It was offered to show what might have happened without the facts in the record to support the hypothesis. Our review of the record does not disclose that Mr. Bare, who put the apparatus together for the YMCA, encountered any difficulty in the leveling of the bars in the instant case. Nor does our review of the record disclose that Mr. Bare encountered any difficulty in the assembly of the apparatus once he received screws with the proper threading. We can find no material facts in the record which indicate that Mr. Bare encountered difficulties such as would indicate that he might be tempted to change the saddle assembly. Hypothetical questions must be based on material facts established by the record, which we do not find in the instant case. *Mercer v. Department of Labor & Indus.*, 74 Wn.2d 96, 442 P.2d 1000 (1968).

■ Moreover, the record reveals that the basis and expected answer of the proposed question were purely speculative in nature. Mr. Ross could not respond with any degree of probability. Expert testimony, assuming arguendo that Mr. Ross was an expert in this field, should not be permitted where it is speculative in nature. *Crowe v. Prinzing*, 77 Wn.2d 895, 468 P.2d 450 (1970).

In view of our disposition of this case, we need not discuss other arguments of the defendant.

The order of the trial court in granting a new trial on damages only is affirmed.

HALE, C.J., STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.

BRACHTENBACH, J. (concurring)—While I concur in the majority opinion, I would clarify the burden of proof rule under Restatement (Second) of Torts § 402A.

Whether it be an exception to that rule, or a refinement thereof, I would hold that a plaintiff has met fully his burden of proof under the cited section when he proves, as did plaintiff here, that the device arrived in the factory

carton and that the user made no change in the device which could have caused the defect. It was uncontradicted that the YMCA made no change in the method of fastening the bar or rail to the saddle. Further, the equipment supervisor of the YMCA said there was no reason to make any such change.

The exception or refinement should then shift the burden to the manufacturer to prove that the cause of the defect was some event or condition for which the manufacturer was not responsible. In effect this is what the majority opinion holds by stating that defendant failed to overturn the plaintiff's evidence. Perhaps that is even the logical consequence of the cited section, but I would spell it out in certain terms.

In this case, the same result would be reached as under the majority opinion. The most that the manufacturer proved, under the burden of proof which I would assign to it, was the speculative theory that the bars could not have been so assembled in its plant. The majority is correct that this is too speculative to meet the burden which I would place upon the manufacturer under these circumstances.

A manufacturer, under a record such as this, should be required to produce in support of his burden of proof evidence more substantial than the testimony that the defective device could not have been produced or shipped in such condition. A manufacturer's self-serving testimony that a defective product could not have been produced in its plant because it never produces defective products should not carry the issue to the trier of the fact.

FINLEY, STAFFORD, and WRIGHT, JJ., concur with BRACHTENBACH, J.

HAMILTON, J. (concurring in part, dissenting in part)—I concur with the view of the majority opinion and of the Court of Appeals that the trial court properly granted a new trial upon the grounds asserted. I am likewise in accord with the majority determination that in *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969), we adopted

the language, and the import thereof, found in the Restatement (Second) of Torts § 402A, comment *g* at 351 (1965), which places the burden of proof upon a plaintiff, alleging injury from a defective product, that the product was in the defective condition when it left the hands of—in this case—the manufacturer.

I am unable to subscribe, however, to the seeming import of the majority opinion as interpreted by the concurring opinion that the burden of proof shifts to the manufacturer to the extent that the manufacturer's evidence must "overturn" plaintiff's evidence. This concept approaches absolute rather than strict liability. Rather than get into the confusing area of shifting burdens of proof, it would be my thought that it is sufficient to say that an injured plaintiff has met his burden, insofar as nonsuit is concerned, when he has produced credible evidence—as in this case—to the effect that: (1) the apparatus or device involved was manufactured or assembled by the defendant manufacturer; (2) it was delivered to the user or an intermediate party; (3) no significant change was made in the product before injury from it; and (4) the product was dangerously and injuriously defective.

The *burden of going forward with the evidence* then falls upon the defendant manufacturer, his responsibility being to produce evidence to the effect that the device or apparatus was not in the asserted defective condition when it left his hands. Unless his evidence in this respect is either absolutely conclusive, or totally insufficient, it ordinarily becomes a question for resolution by the trier of the facts as to whether or not the plaintiff has sustained the burden of proof normally resting upon a plaintiff's shoulders. To hold otherwise, as the majority opinion would appear to do, is to render our adoption of Restatement (Second) of Torts § 402A, comment *g*, in *Ulmer v. Ford Motor Co., supra*, meaningless. Such a result inevitably casts the trial and appellate courts into the position of seeking to unravel and reconcile our former implied warranty cases and moves the burden of proof back and forth on a case-by-case basis. I

am convinced that, with the deliverance of the *Ulmer* decision, this court sub silentio superseded and overruled those implied warranty cases insofar as they held or implied that the burden of proof, as distinguished from the burden of going forward with exculpatory evidence, shifted in strict liability cases from one party to another, *e.g., Pulley v. Pacific Coca-Cola Bottling Co.*, 68 Wn.2d 778, 415 P.2d 636 (1966).

Unfortunately, in my opinion, the trial court in granting plaintiff's motion for a directed verdict on liability as to defendant Premier Athletic Products Corporation (hereafter referred to as Premier), erroneously relied upon the *Pulley* case and its shifting burden of proof theory. This, then, brings me to a second departure from the result of the majority opinion, which is to the effect that the cause must be remanded for a new trial on the issue of liability as well as damages.

Before discussing the evidentiary pattern, it is interesting to review briefly the pleading and procedural aspects as the case progressed to verdict. Plaintiff, by her complaint, proceeded against both defendants Premier and the YMCA on a theory of negligence and against Premier also under the doctrine of strict liability. The YMCA answered denying negligence and cross-claimed against Premier alleging negligent design and manufacture. Premier answered denying generally plaintiff's and cross-complainant's allegations. Premier asserted no affirmative defense.

With commencement of the trial, plaintiff's counsel announced he was proceeding against Premier on the theory of strict liability only and against the YMCA on the theory of negligence. At the conclusion of all of the evidence, the YMCA moved for dismissal on the basis that the evidence was insufficient to establish negligence on its part and that it was not subject to the doctrine of strict liability. Plaintiff virtually joined the YMCA's motion by conceding that the evidence was insufficient on the issue of negligence and that the YMCA's liability under a theory of strict liability

was questionable. Plaintiff reserved only the contention that, if the trial court believed the evidence concerning the actions of the YMCA sufficient to create a jury question as to the liability of Premier, then it was sufficient to retain the YMCA as a party defendant on the theory of negligence. No reference appears to have been made to the doctrine of res ipsa loquitur. In granting the YMCA's motion, the trial court stated with respect to the issue of negligence:

> I am going to eliminate the claim of negligence against the YMCA. I feel I have been invited to do that. I feel that this is a decision of the plaintiff which it has a right to make. She has indicated that this is her position in light of all the evidence, every bit of which she, through her counsel, is as well aware of as I am, and I will eliminate that issue on the basis of the statements of counsel.

In granting the same motion with respect to the issue of strict liability, the trial court concluded that the doctrine did not extend to the YMCA because it was an eleemosynary corporation.

In granting the plaintiff's motion for a directed verdict on liability against Premier, the trial court seized upon language in the *Pulley* opinion relative to a manufacturer's burden of proof and to a requirement that such burden be met by direct evidence establishing an intervening source of a claimed defect in a defective product, and concluded that the circumstantial evidence adduced by Premier failed to meet such a test.

As heretofore indicated, I believe the *Ulmer* decision modified the burden of proof theory of *Pulley*, and implicitly carried with it the proposition that a defendant manufacturer in a strict liability situation may show by appropriate circumstantial evidence that the product involved left its hands in a safe, nondefective condition.

In undertaking a review of the evidence presented for evaluation in connection with plaintiff's motion for directed verdict on the issue of liability, it must be recognized, as

the majority opinion purports to do, that plaintiff's motion

admits the truth of the opponent's evidence, together with all reasonable inferences arising therefrom, and requires a most favorable interpretation thereof.

*Holdcroft v. Hahn Truck Co.*, 71 Wn.2d 410, 429 P.2d 204 (1967).

In the instant case, there can be no question but that plaintiff's injuries were occasioned by an improper fastening of the parallel bar to the metal saddles upon which it rested. This improper fastening consisted of the four screws of each saddle (one at each end of the parallel bar) being inadequately threaded into the bar a fraction of an inch from the four predrilled pilot holes. Whether the screws could be forced into the bar without lead holes was in question by virtue of the fact that such bars are made of hickory. In any event, if lead holes were drilled they would have been substantially smaller than the predrilled pilot holes.

Thus, the critical factual question in the case is: Who affixed the saddles in such a manner? Premier, the manufacturer, or someone at the YMCA in whose exclusive custody the bars were from the latter part of November, 1967, to the date of the accident, June 9, 1968?

Plaintiff, in her case in chief, called Mr. Claude Bare, presumably as an adverse witness. Mr. Bare, an ironworker by occupation, was a member of the Board of Directors of the YMCA and a part-time volunteer instructor in or supervisor of the YMCA's gymnastic program. In essence, he testified that: at his urging the YMCA ordered, through its national organization, a set of parallel bars; the parallel bars in question arrived in slightly roughed-up cartons in the latter part of November, 1967; the saddles upon which the bars or rails rest when attached to the uprights were attached to the bars; he examined and tested with his hands the saddle attachments and deemed them to be in good condition; around Christmas time, 1967, he first assembled the bars and uprights and tested the assembly with the bars in an even, or men's, position by performing

a "kip" upon them; although this was his first experience in assembling a parallel bar apparatus, he paid scant attention to the assembly instructions; he experienced some difficulty with a brace which is utilized when the bars are placed in an uneven, or girl's, position and, at his request, the factory modified the brace to overcome his problem; the plaintiff, Charlene Curtiss, was the first girl to use the bars in the uneven, or girl's, position since the acquisition of the bars and on the evening of the accident, June 9, 1968; the bars, when not in use, were customarily stored in a locked store-room provided for gymnastic equipment to which he and one other person had keys; and he did not remove, change, or alter the saddle mountings at any time after receipt of the bars and before the accident.

On cross-examination, Mr. Bare admitted that he had previously testified by way of deposition that the bars had been tested sometime before the accident in both the even and uneven positions; the bars had been used by both boys and girls; and, on the evening of the accident, another girl gymnast may have performed some movements on the bars prior to Charlene Curtiss' tragic maneuver.

By way of corroboration of Mr. Bare, plaintiff called an expert witness, who testified he had examined the bar in question both visually and by radiograph and, in his opinion, the main pilot holes were devoid of any indication of ever having any screws threaded into them.

Defendant Premier's evidence in response consisted of the testimony of the company president, an employee, a former employee and an expert witness. In substance, the president and the two employee witnesses testified that: during the developmental and production stages of Premier's entry into the marketing of parallel bars in 1967, the two employee witnesses were the only persons in the plant who attached saddles to parallel bars; the saddles were always attached by and through the use of the predrilled pilot holes; neither of the employees had ever, either in the experimental or production stages, attached a saddle in

the manner revealed in the instant case; to the best of the witnesses' knowledge, no parallel bar had ever left the factory with saddles attached other than by way of the predrilled pilot holes; and, unless the uprights were properly located on the base according to the instructions, difficulty in matching the saddles thereto could be encountered.

As with Mr. Bare, the company president's testimony was impeached to the extent of an admission that the bar in question could possibly be an experimental bar and that it did not meet NCAA standards in the sense that the distance between the saddles was some 2 inches less than that specified by the standards.

The expert witness called by the defendant stated that, from his examination of the offending bar and the radiograph pictures in evidence, the predrilled holes indicated that screws had theretofore been threaded into them. He further testified that the screw heads had the appearance of being driven in and backed out, and that some of the driving and backing had been done by an improperly-sized screwdriver.

The trial court, as well as the majority opinion, places great emphasis on the testimony of Mr. Bare to the effect that he did not alter the saddle assembly between November, 1967, and June, 1968. Overlooked, however, is the fact that Mr. Bare can be characterized as an interested witness who, under all of the circumstances, would indeed be most reluctant to admit that any alteration in the saddle attachment had been made by him or anyone else at the YMCA, if in fact such alteration had occurred. Likewise minimized is the fact that Mr. Bare's testimony was impeached concerning the extent and nature of the use to which the parallel bars had been subjected prior to the accident. Even if Mr. Bare's testimony stood uncontradicted and unimpeached,

it was the function of the jury to determine whether or not they believed any particular witness, and they are not obligated to believe any testimony even though there

be no contradiction or impeachment of the witness. [Citing cases.]

*Scanlan v. Smith*, 66 Wn.2d 601, 603, 404 P.2d 776 (1965).

In any event, the direct testimonies of the employee and former employee of Premier were to the effect that at the time in question: (a) they were the only two men in the plant who affixed saddles to parallel bars; (b) they had never affixed any saddles in the manner revealed by the accident, and (c) to their knowledge no bars had left the plant with saddles so attached. This testimony, coupled with that of the defendant's expert witness, concerning the appearance of the predrilled holes and the screwheads, would appear to contradict inferentially, if not directly, the gist of Mr. Bare's testimony. Certainly, the admission of Premier's president in response to a leading question that it was possible that the parallel bar in question may have been an experimental bar is subject to more than one interpretation with respect to candidness and credibility.

The cases are legion which point out that in jury trials it is the exclusive province of the jury to resolve conflicts and inconsistencies in the evidence and to determine the weight and credibility to be attached to the testimony of the various witnesses.

As deeply sympathetic as I feel over the horrendous injury inflicted upon the minor plaintiff, I am, nonetheless, compelled under the evidence, as I view it, to conclude that the new trial should be had upon the issue of liability as well as damages.

ROSELLINI and UTTER, JJ., concur with HAMILTON, J.

Petition for rehearing denied October 18, 1973.