[No. 4228–1. Division One. March 20, 1978.]

VICKI L. LAMON, *Appellant,* v. McDONNELL DOUGLAS
CORPORATION, *Respondent.*

*Jerry Schumm,* for appellant.

*Lane, Powell, Moss & Miller* and *G. Val Tollefson,* for respondent.

CALLOW, J.—The plaintiff, an airline stewardess, stepped into an open emergency hatch of a DC–10 airplane. She appeals from a summary judgment dismissing her personal injury action against the aircraft manufacturer.

The hatch in question is an integral part of the aircraft. It was put in the only area where it could be located for a variety of safety and design considerations. It is described in the "emergency exits" section of the DC–10 Cabin Attendants Familiarization Manual as follows:

### Galley Escape Hatch and Ladder

An escape hatch, located in the forward right corner of the lower galley ceiling opening into the forward cabin right aisle floor, provides an alternate means of exit from the lower galley during abnormal conditions. A permanently attached ladder extends from the galley floor to the escape hatch. The hatch cover carpet is flush with the floor and held in place within its frame with velcro. It may be opened from the lower galley by pushing on the under side. The hatch cover can also be opened from the cabin. The covering carpet is held in position with velcro and can be lifted to expose a recessed handle in the hatch cover.

The plaintiff, as one of the cabin attendants, was familiar with the hatch. Furthermore, just before she stepped into it, she had seen another stewardess come up through it, announce that there had been a power failure necessitating its use, and then go back down into it. The plaintiff filed the affidavit of a California engineer which stated that he specialized in the reconstruction and analysis of industrial and traffic accidents and that:

On April 5, 1975, I examined the galley escape hatches on a DC–10 and a Boeing 747 airplane. The examination was made at the Seattle–Tacoma airport and the airplanes were part of the United Airlines fleet. Based on this examination it is my opinion that the design of the escape hatch cover on the DC–10 created an unreasonably dangerous condition for the cabin attendants. The condition was created because the hatch cover on the DC–10 consists of a loose panel, and in order to close the hatch after use the loose hatch cover has to be manually fitted into the hatch opening. If after using the hatch the user were to forget to replace the hatch cover the open hatch would constitute a serious hazard to cabin attendants who often have to walk backward in the performance of their duties. If when replaced the hatch cover were not properly fitted into the hatch opening it could act as a trap door and endanger the person stepping on it. The dangerous features of the DC–10 hatch cover are not present in the design of the Boeing 747 galley hatch cover. While quite similar in other respects, the Boeing 747 hatch cover is hinged to the floor and is equipped

with a spring device which automatically closes and keeps the hatch cover closed when the hatch is not in use.

The following issues are presented: (1) What is the quantum of proof that must be presented before a plaintiff may submit a strict tort liability case to a jury? (2) Is a strict tort liability case, based on a manufacturer's failure to warn, made out where the condition in question is known to the plaintiff? (3) In a strict tort liability case, is a jury issue on liability presented when an expert witness states that, in his opinion, a product is defective, dangerous or unsafe?

■ A products liability case involves the claimed liability of a manufacturer, processor or nonmanufacturing seller for injury to the person or property of a buyer or third person caused by a product which has been sold. 1 R. Hursh & H. Bailey, *American Law of Products Liability* § 1:1 (2d ed. 1974); 63 Am. Jur. 2d *Products Liability* § 1 (1972). Products liability cases are ordinarily predicated on one or more of three legal theories: strict tort liability, negligence and breach of warranty. Here, the plaintiff is relying primarily on the theory of strict tort liability. Strict tort liability is not absolute liability. It is "strict" in the sense that it is unnecessary for a plaintiff proceeding under that theory to prove that a defendant was negligent, and the defendant does not have available the defenses of lack of privity, lack of notice and disclaimer. 1 R. Hursh & H. Bailey, *American Law of Products Liability* § 4:10 (2d ed. 1974); 63 Am. Jur. 2d *Products Liability* § 123 (1972).

The doctrine of strict tort liability was enunciated in *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969). The opinion adopted Restatement (Second) of Torts § 402A (1965), which states:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical

harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The doctrine has been held applicable in a number of cases including *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 570 P.2d 438 (1977); *Seattle–Frist Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975); *Baumgardner v. American Motors Corp.,* 83 Wn.2d 751, 522 P.2d 829 (1974); and *Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 550 P.2d 71 (1976).

 We must first inquire whether a duty was owed by the manufacturer to the injured party and whether or not that duty was breached. *See Baumgardner v. American Motors Corp., supra* at 756. The instant case involves a claim that the product, although well manufactured, was defectively designed. The test to be applied to determine liability in strict tort liability design defect cases was enunciated in *Seattle–First Nat'l Bank v. Tabert, supra* at 149–51, as follows:

[S]trict liability does encompass a design defect . . .

A product may be just as dangerous and capable of producing injury whether its condition arises from a defect in design or from a defect in the manufacturing process. While a manufacturing defect may be more easily identified or proved, a design defect may produce an equally dangerous product. The end result is the same—a defective product for which strict liability should attach.

. . .

The doctrine of strict liability does not impose legal responsibility simply because a product causes harm.

Such a result would embody absolute liability which is not the import of strict liability. . . .

. . . The literal language of the section creates liability for a product in a *defective condition* which is *unreasonably dangerous*. The Restatement comments add flesh to these bare bone words. Under comment *g* entitled *"Defective condition"* it is stated:

> The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, *in a condition not contemplated by the ultimate consumer,* which will be unreasonably dangerous to him.

(Italics ours.)

> Comment *i,* entitled *"Unreasonably dangerous"* states: The article sold must be dangerous to an extent beyond that *which would be contemplated by the ordinary consumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics.

(Italics ours.)

Continuing, the opinion states at page 154:

> If a product is unreasonably dangerous, it is necessarily defective. The plaintiff may, but should not be required to prove defectiveness as a separate matter.

> Likewise, unreasonably dangerous implies a higher and different standard than what we conceive to be the intended thrust of section 402A strict liability. The emphasis is upon the consumer's reasonable expectation of buying a product which is reasonably safe. The ordinary consumer evaluates a product in terms of safety, recognizing that virtually no product is or can be made absolutely safe. Certainly that is the case with the automobile and all of its potential for injury.

> Thus, we hold that liability is imposed under section 402A if a product is not reasonably safe. This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. This evaluation of the product in terms of the reasonable expectations of the ordinary consumer allows the trier of the fact to take into account the intrinsic nature of the product. The purchaser of a Volkswagen cannot reasonably expect the same degree of safety as would the buyer of the much more expensive Cadillac. It must be borne in mind that we are dealing with a relative, not an absolute concept.

In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

It cannot be said as a matter of law that the design of the escape hatch was defect free when the evidence is viewed (a) in the light most favorable to the plaintiff, (b) with the testimony of the expert in mind, and (c) taking the reasonable expectations of the consumer along with the intrinsic nature of the product into consideration.

■■ In order to prove strict liability, a plaintiff must prove (1) that there was a defect, (2) which existed at the time the product left the hands of the manufacturer, (3) which was not contemplated by the user, (4) which renders the product unreasonably dangerous, and (5) which was the proximate cause of the plaintiff's injury. *Ulmer v. Ford Motor Co., supra; Simmons v. Koeteeuw,* 5 Wn. App. 572, 489 P.2d 364 (1971); 45 Wash L. Rev. 431 (1970). A product is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases the product. Restatement (Second) of Torts § 402A, comment *i* (1965). A product has been called "inherently and imminently dangerous" to human safety when substantial harm is to be anticipated if it is defective. *Dipangrazio v. Salamonsen,* 64 Wn.2d 720, 725, 393 P.2d 936 (1964). Likewise, in *Passwaters v. General Motors Corp.,* 454 F.2d 1270 (8th Cir. 1972), a product has been said to be unreasonably dangerous if there is an unreasonable risk of causing substantial bodily harm to one whom the manufacturer should expect to be in the vicinity of probable use. Thus, we find various definitions for the term "unreasonably dangerous" depending upon whether the approach to the term is from the standpoint of the purchaser, the ordinary user, or the

plaintiff, but each definition reaches the same general concept that hazards must exist in the product of which the user would not be expected to be aware and which would not be contemplated by the ordinarily experienced user of that product. *Sherrill v. Royal Indus., Inc.,* 526 F.2d 507, 512 (8th Cir. 1975); *Orfield v. International Harvester Co.,* 415 F. Supp. 404, 406 (E.D. Tenn. 1975), *aff'd,* 535 F.2d 959 (6th Cir. 1976). The obviousness of the defect is only a factor to be considered in determining whether a defect is unreasonably dangerous, *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976); and whether a product is unreasonably dangerous depends also on the possible seriousness and the cost of preventing the harm, as well as the foreseeability thereof. *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F. Supp. 353, 368 (E.D.N.Y. 1972).

A defective condition is a condition not contemplated by the ultimate user and which presents a hazard which he would not expect. *Bunn v. Caterpillar Tractor Co.,* 415 F. Supp. 286, 290 (W.D. Pa. 1976), *aff'd,* 556 F.2d 564 (3d Cir. 1977); *Casrell v. Altec Indus., Inc.,* 335 So. 2d 128, 133 (Ala. 1976); *Snider v. Bob Thibodeau Ford, Inc.,* 42 Mich. App. 708, 202 N.W.2d 727, 730 (1972).

The terms "defective condition" and "unreasonably dangerous" have been defined as essentially synonymous. *Welch v. Outboard Marine Corp.,* 481 F.2d 252, 255 (5th Cir. 1973); *Matthews v. Campbell Soup Co.,* 380 F. Supp. 1061, 1063 (S.D. Tex. 1974).

The burden of proof is upon a plaintiff alleging injury from a defective product to show that the product was in a defective condition when it left the hands of the manufacturer. *Curtiss v. YMCA,* 82 Wn.2d 455, 511 P.2d 991 (1973); *Ulmer v. Ford Motor Co., supra; Bombardi v. Pochel's Appliance & TV Co.,* 10 Wn. App. 243, 518 P.2d 202 (1973). As noted in the *Bombardi* case, if a product fails under conditions concerning which an average consumer would be entitled to expect performance, then a jury would have a basis for making an informed judgment upon the existence of a defect. *Bombardi,* at 247. If the evidence

presented of a defect is such that a jury could reasonably infer that the product was defective, then the plaintiff is entitled to proceed to trial. Therefore, the issue is narrowed to what is the quantum of proof requisite to show that a design was defective in that it presented dangers which could not be reasonably foreseen by the user. Here, we have an expert witness testifying that such a design defect existed. If the evidence is taken at this point as it must be in the light most favorable to the nonmoving party, then the plaintiff is entitled to have his case heard by the trier of the fact.

*Seattle–First Nat'l Bank v. Tabert, supra,* states that the product must be evaluated in the terms of the reasonable expectation of the consumer by the trier of the fact in light of the intrinsic nature of the product. The defendant had a duty to exercise reasonable care in designing an escape hatch that did not involve an unreasonable risk of harm to cabin personnel who would be working in the vicinity of the hatch. *Spellmeyer v. Weyerhaeuser,* 14 Wn. App. 642, 647, 544 P.2d 107 (1975).

We recognize that there is no duty on the part of the manufacturer to give warning of a product–connected danger where the person who claims to be entitled to the warning knows of the danger. Where the product–connected danger is obvious or known, the manufacturer or seller has no duty to warn. *Haysom v. Coleman Lantern Co.,* 89 Wn.2d 474, 479, 573 P.2d 785 (1978); *Ewer v. Goodyear Tire & Rubber Co.,* 4 Wn. App. 152, 162, 480 P.2d 260 (1971); Restatement (Second) of Torts § 402A, comment *j* (1965).

The failure to warn or the giving of an inadequate warning may cause a product to be unsafe and thus give rise to a strict tort liability cause of action. *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 570 P.2d 438 (1977); Restatement (Second) of Torts § 402A, comments *h* and *j* (1965). However, awareness of the existence of an obvious dangerous condition does not, of itself, absolve the manufacturer of

liability for a defective design. As noted in *Seattle–First Nat'l Bank v. Tabert, supra* at 155:

> [D]efendant contends that the design of . . ., and any defect, was open and obvious, precluding recovery. It is true that comment *n,* section 402A recognizes that assumption of the risk may be a defense in a strict liability case when it consists of voluntarily and unreasonably proceeding to encounter a known danger, *i.e.,* would a reasonably prudent person continue voluntarily to use a product in the face of a known, open and obvious danger? This was acknowledged in *Brown v. Quick Mix Co.,* 75 Wn.2d 833, 836, 454 P.2d 205 (1969):
>
>> [T]he fact that a danger is patent does not automatically free the manufacturer from liability, but does so only if the plaintiff voluntarily and *unreasonably* encounters it.

■ Opinion testimony otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of the fact. *Gerard v. Peasley,* 66 Wn.2d 449, 454, 403 P.2d 45 (1965); *Palmer v. Massey–Ferguson, Inc.,* 3 Wn. App. 508, 510, 476 P.2d 713 (1970). *See* Fed. R. Evid. 704, at 156, and Washington Proposed Rules of Evidence 704, at 41–42. The evidence admitted upon trial must support the opinion of the expert that is expressed to the trier of the fact. *See Curtiss v. YMCA, supra* at 466; 1 R. Hursh & H. Bailey, *American Law of Products Liability* § 1:24, at 82 (2d ed. 1974). Likewise, as noted in E. Cleary, *McCormick's Handbook of the Law of Evidence* § 13, at 31 (2d ed. 1972):

> Nor will expert opinion be admitted if the court believes that an opinion based upon the facts in evidence cannot be reasonably grounded upon those facts.

*Accord,* 31 Am. Jur. 2d *Expert and Opinion Evidence* § 36, at 538 (1967); *Crowe v. Prinzing,* 77 Wn.2d 895, 897, 468 P.2d 450 (1970). This question must be presented to the trial judge at the time of the trial. Suffice it to say that at this juncture a question for the jury was presented.

The dismissal of the cause of action upon summary judgment is reversed and the cause is remanded for trial.

SWANSON, J., concurs.

ANDERSEN, J. (dissenting)—The defendant in this products liability action is a large manufacturing corporation. The strict liability principles of law which are expressed in this case, however, are equally important to everyone who is engaged in the business of selling products. This is because every manufacturer, wholesaler, distributor and retailer, large or small, insured or not, is subject to liability for products sold which are later determined to not be reasonably safe. *See Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 147–49, 542 P.2d 774 (1975).

I respectfully dissent from the majority opinion on two grounds:

1. There is a legal threshold which must be crossed before a plaintiff has a legally sufficient strict tort liability case. I would hold that the plaintiff's proof did not cross that threshold.

2. In a strict tort liability case, a jury issue on liability is not automatically presented whenever an expert witness opines that a product is defective, dangerous or unsafe regardless of the basis of that opinion. I would hold that the opinion of the plaintiff's expert was not sufficient to get her case past the defendant's motion for summary judgment.

## FACTS OF CASE BRIEFLY RESTATED

The plaintiff is an airline stewardess who stepped into an open emergency hatch of the DC–10 airplane on which she was working. She brought a products liability action against the aircraft manufacturer based primarily on strict tort liability. It is uncontroverted that the escape hatch was precisely where it had to be and that the plaintiff was completely familiar with it. Just before she stepped into the open hatch, the plaintiff had seen another stewardess come up through the hatch, heard her say that there had been a

power failure necessitating its use and then saw her go back down into it.

The summary judgment of the trial court dismissing the plaintiff's personal injury action should be affirmed.

GROUND 1

The plaintiff's proof did not reach the threshold as to what constitutes a legally sufficient strict tort liability cause of action.

The law of strict tort liability is court–made law. It has been the law of this state since 1969 when the State Supreme Court adopted Restatement (Second) of Torts § 402A. Having adopted this doctrine from the Restatement, our courts in interpreting it have understandably relied heavily on the official comments thereto and on the writings of the reporters of the Restatement, particularly Dean John M. Wade, Reporter, Restatement (Second) of Torts, and Dean William L. Prosser, his predecessor.

The case before us requires that a delineation be made between the respective functions of court and jury in strict tort liability design defect cases. As to this, Dean Wade's analysis should be followed. As he very eruditely expresses it:

Judge and Jury

In an action for negligence it is normally the function of the jury to determine whether the defendant was negligent, subject, of course, to the authority of the judge to direct a verdict for the defendant, if he finds that the jury could not reasonably find for the plaintiff. On the other hand, in an action based on strict liability of the *Rylands* type, [*Rylands v. Fletcher*, L.R. 1 Ex. 269 (Ex. Ch. 1866), *aff'd*, L.R. 3 H.L. 339 (1868)] for an abnormally dangerous activity, the determination as to whether strict liability will be imposed for the activity is held to be one for the judge, not the jury—for the reason that the decision involves issues of general social policy. In the products cases the courts seem not to have approached the problem in this fashion. Instead, they seem to have assumed that strict products liability is like negligence in this respect, so that a plaintiff, in order to recover, must convince the jury that the product was

"defective" or "unreasonably dangerous" or "not duly safe," or whatever test is used. This generally works quite satisfactorily when the question is whether the product was unsafe because of an error in the manufacturing process so that it was not in the condition in which it was intended to be. The issue then seems more factual, of the kind the jury is accustomed to handling. The difficulty comes when it is not just the single article which is to be classed as unsafe because something went wrong in the making of it, but a whole group or class or type which may be unsafe because of the nature of the design. It is here that the policy issues become very important and the factors which were enumerated above must be collected and carefully weighed. [See the "reasonable expectations" factors enumerated in *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975)]. It is here that the court—whether trial or appellate—does consider these issues in deciding whether to submit the case to the jury. If a plaintiff sues the manufacturer of a butcher knife because he cut his finger, on the sole ground that the knife was so sharp that it was likely to cut human flesh, the court would probably take the case out of the hands of the jury and not give it the opportunity to find that the knife was unsafe. Similarly with an aspirin manufacturer, when an ordinary tablet stuck to the lining of the plaintiff's stomach and caused a hemorrhage, or the manufacturer of the Pasteur treatment for rabies, when there were untoward reactions. The problem in these cases is likely to be called one of law and decided by the court. Court control of jury action is more extensive here than in the ordinary negligence action. And yet, of course, if the court decides that it would be reasonable to allow the jury to find for the plaintiff, the issue of lack of due safety will be submitted to the jury even in these cases.

(Footnotes omitted.) J. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 838–39 (1973).

The doctrine of strict tort liability has been a rapidly developing doctrine in this state as elsewhere. As such, the emphasis of the many decisions and articles on the subject has been on the course and nature of the expansion of the doctrine. The issues presented in the present case, however, require that the other end of the spectrum be examined—

the threshold which a strict tort liability case must cross in order to constitute a case which is legally sufficient to be submitted to the jury.

This, and all jurisdictions, have repeatedly enunciated the proposition that strict tort liability does *not* mean absolute liability and that the manufacturer, processor or other seller is *not* an insurer that no one under any circumstances will ever sustain injury from the manufactured product. 1 R. Hursh & H. Bailey, *American Law of Products Liability* § 4:6 (2d ed. 1974); 63 Am. Jur. 2d *Products Liability* § 127 (1972); *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 150, 542 P.2d 774 (1975). The question therefore is not *whether* a legal threshold exists in a strict tort liability case, but *where.*

In addressing the issue of whether or not there has been a breach of the duty to furnish a reasonably safe product as contemplated by the ordinary consumer or user, the test enunciated in *Seattle–First Nat'l Bank v. Tabert, supra,* we are not without quite specific guidelines as to what products are considered to be reasonably safe as a matter of law.

Dean Prosser in his landmark work, *The Fall of the Citadel,* states:

> Few, if any products, of course, are absolutely safe. Any knife will cut, any hammer wielded unskillfully will mash a thumb, any food can cause indigestion; and no one supposes that the producer of such things is to be held liable when someone is hurt.

50 Minn. L. Rev. 791, 807 (1965–66).

Dean Wade writes:

> Strict products liability clearly does not require a perfectly safe product. A simple instrument like a hammer, for example, will not infrequently smash a finger or thumb if used unskillfully. It could probably be designed to make this possibility less likely, but at the cost of impairing its usefulness. Despite the dangers which the hammer creates, it is treated as reasonably safe. Or consider an automobile. It occasionally may be involved in

an accident in which there is no fault on the part of any-
one. It is designed, for example, to go so fast that if an
obstacle suddenly and unexpectedly looms in front of it,
the driver will be unable to stop or swerve in time to
avoid a collision. Yet the manufacturer is not held liable
if this happens. Nor is the manufacturer of an airplane
automatically held liable if the plane crashes. Take an
object for internal human consumption—*e.g.,* aspirin,
which may occasionally cause serious internal bleeding or
produce other complications, or penicillin, to which the
reactions of some persons are quite drastic. Yet there is
no contention that the manufacturer should be held to an
insurer's liability.

(Footnote omitted.) J. Wade, *Strict Tort Liability of Man-
ufacturers,* 19 Sw. L.J. 5, 16–17 (1965).

Although the term "unreasonably dangerous" is not
included in the *Seattle–First Nat'l Bank v. Tabert, supra,*
test, as such, its definition is nonetheless instructive.
Restatement (Second) of Torts § 402A, comment *i* states:

> *i. Unreasonably dangerous.* The rule stated in this
> Section applies only where the defective condition of the
> product makes it unreasonably dangerous to the user or
> consumer. Many products cannot possibly be made
> entirely safe for all consumption, and any food or drug
> necessarily involves some risk of harm, if only from over-
> consumption. Ordinary sugar is a deadly poison to
> diabetics, and castor oil found use under Mussolini as an
> instrument of torture. That is not what is meant by
> "unreasonably dangerous" in this Section. The article
> sold must be dangerous to an extent beyond that which
> would be contemplated by the ordinary consumer who
> purchases it, with the ordinary knowledge common to the
> community as to its characteristics. Good whiskey is not
> unreasonably dangerous merely because it will make
> some people drunk, and is especially dangerous to alco-
> holics; but bad whiskey, containing a dangerous amount
> of fusel oil, is unreasonably dangerous. Good tobacco is
> not unreasonably dangerous merely because the effects of
> smoking may be harmful; but tobacco containing some-
> thing like marijuana may be unreasonably dangerous.
> Good butter is not unreasonably dangerous merely
> because, if such be the case, it deposits cholesterol in the

arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

In considering the hatch in question, Dean Wade teaches us that in certain classes of cases involving claims of design defect, the decision of whether strict liability should be imposed should be decided as an issue of law by the courts "for the reason that the decision involves issues of general social policy." J. Wade, *On the Nature of Strict Tort Liability, supra* (quoted above). Furthermore, *Seattle–First Nat'l Bank v. Tabert, supra* at 154, instructs that in determining the reasonable expectations of the ordinary consumer, the nature of the product itself may make unique factors relevant.

Here the product involved is itself a safety device—an emergency escape hatch. Its whole reason for existence is to protect people, not injure them. What the ordinary users (consumers) of this escape hatch reasonably expect of it is the fastest possible escape route from the enclosed aircraft compartment, where their work stations are, in the event of an emergency. It is uncontroverted that the hatch in the present case was located where it had to be. At the time of the accident, an emergency had occurred and the hatch was functioning as an escape hatch—the exact purpose for which it was designed and intended. There was no patent defect in the product or any part of it, nor was there a latent defect as in *Seattle–First Nat'l Bank v. Tabert, supra,* where the product lacked structural integrity. It should be held as a matter of law that the emergency escape hatch here involved was reasonably safe as contemplated by the ordinary user. The public policy behind the whole concept of strict tort liability is to encourage the protection of consumers—not to discourage it. Restatement (Second) of Torts § 402A, comment *f.*

## GROUND 2

The basis of an expert witness' opinion that a product is defective, unreasonably dangerous or not reasonably safe, cannot be deduced or inferred from the conclusion itself. The opinion of an expert on the ultimate issue does not by itself constitute either proof of the facts necessary to support the opinion or sufficient evidence to take a case to the jury, unless there are facts in the record on which the opinion can reasonably be predicated.

Even if the product in question is not of the particular kind which should be determined to be reasonably safe as a matter of law, as I would hold, the plaintiff's showing still did not establish an issue of fact as to the product not being reasonably safe. The lack of proper safety devices may in some instances constitute a defective design for which there may be recovery under the doctrine of strict tort liability. *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603, 605 (1968). On the other hand, as one commentator has expressed it, "[t]he safest airplane which could possibly be designed would never leave the ground, because it would be so laden with safety devices that it would be unable to fly." 42 Wash. L. Rev. 601, 608 (1966–67). In order to have a jury issue as to the unsafeness of the product, however, appropriate proof must be presented.

Here the plaintiff relied on the affidavit of an engineer to supply that proof. The use of expert witnesses in products liability cases is often helpful and, indeed, is sometimes essential. In modern day trial practice, such witnesses are frequently used. Advertising by expert witnesses in legal periodicals is now also common practice. Hundreds of expert witnesses who, for a fee, will testify in most fields of expertise are listed in at least one national publication, H. Philo, D. Robb & R. Goodman, *Lawyers Desk Reference: Technical Sources for Conducting a Personal Injury Action* (5th ed. 1975).

In this jurisdiction, as in many others, opinion testimony which is otherwise admissible is not objectionable just because it embraces an ultimate issue to be decided by the

trier of fact. This does not mean, however, that a jury case is automatically made out every time an expert witness states an opinion that a given product is defective, dangerous or not reasonably safe. If that were so, there might very well be as a practical matter that which the law otherwise denies, and every manufacturer, processor and seller of a product would be absolutely liable and an insurer that no one under any circumstances would ever sustain damage or be injured by the product—or, at least, that a jury issue could always be made out to that effect.

The only portions of an evidentiary affidavit which can be considered in a summary judgment proceeding are those parts which are made on the personal knowledge of the affiant, set forth facts which would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. *Jacobsen v. State,* 89 Wn.2d 104, 108, 569 P.2d 1152 (1977). The affidavit must indicate on its face that the information contained therein is upon personal knowledge and this requirement cannot be inferred. *Echaide v. Confederation of Canada Life Ins.,* 459 F.2d 1377, 1381 (5th Cir. 1972). Examined in this light, what the affidavit of the plaintiff's engineer says is only this: that the plaintiff had to use the aisleway where the hatch was located; that a different aircraft manufacturer uses a hinged escape hatch cover that automatically closes; and that in his opinion, the defendant's hatch cover, which did not automatically close, was unreasonably dangerous.

In order to bring this issue into focus, some rhetorical questions should be posed.

If a person walks into the edge of an open door and is injured, is a jury case made out if an engineer testifies that the injured person had to use the room where the door was located, that some doors close automatically and in his opinion the door which did not automatically close was not reasonably safe?

If a person who has to use a particular room where a square table is located walks into the corner of a table in

that room and is injured, is a jury case made out if an engineer points out that some tables are round and in his opinion the square table is not reasonably safe? Or to use the converse, if the square table in the room is then replaced by a round table, and an object falls off of the round table that probably would not have fallen from the square table and injures someone's foot, is a jury case made out by an engineer testifying that some tables are square and in his opinion the round table was not reasonably safe?

It should not be held that a jury case is made out in any of these illustrative situations.

Unless factual evidence in the record supports an expert witness' opinion, the opinion by itself should not be legally sufficient to get the issue on which it was expressed past an appropriate challenge.

> An opinion of an expert must be based upon facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support that conclusion. Expert opinion is inadmissible if its factual foundation is nebulous.

(Footnotes omitted.) 31 Am. Jur. 2d *Expert and Opinion Evidence* § 36, at 538 (1967). *Accord,* E. Cleary, *McCormick's Handbook of the Law of Evidence* § 13, at 31 (2d ed. 1972); 1 R. Hursh & H. Bailey, *American Law of Products Liability* § 1:24, at 82 (2d ed. 1974); *Curtiss v. YMCA,* 82 Wn.2d 455, 466, 511 P.2d 991 (1973); *Crowe v. Prinzing,* 77 Wn.2d 895, 897, 468 P.2d 450 (1970).

It is the policy of our summary judgment rule, CR 56(e), to allow affidavits to contain all evidentiary matter which, if the affiant were in court and testifying on the witness stand, would there be admissible as a part of his or her testimony. 6 J. Moore, Fed. Prac., pt. 2, ¶ 56.22[1], at 56–1321 (1976); *American Securit Co. v. Hamilton Glass Co.,* 254 F.2d 889, 893 (7th Cir. 1958). There is therefore no reason why the trial court at a summary judgment hearing, or this court as an appellate court, should not here be in just as good a position to pass on the legal sufficiency of what the expert said in his affidavit (as perhaps distinguished from

his qualifications) as would be a trial court listening to the same thing being testified to by the witness at a trial.

Plaintiff's expert witness did not attest to the hatch in question violating any industry or safety standards. He essentially based his opinion that the hatch was unreasonably dangerous on the fact that another aircraft manufacturer used a different hatch design. As the witness' affidavit notes, the other manufacturer's hatch is hinged to the floor and has a spring device which automatically closes the hatch and keeps it closed. That fact was not sufficient on which to base his stated opinion.

While evidence of a general industry standard or custom would be admissible, evidence of the contrary practices of a single other business is not.[1] *Haysom v. Coleman Lantern Co.*, 89 Wn.2d 474, 487, 573 P.2d 785 (1978). The defendant manufacturer may well have opted for the simpler hatch design it used because of a belief that it was less likely to jam in an emergency—and where a delay of seconds in exiting the aircraft could well mean the difference between life and death for the stewardesses working in the enclosed galley below the passenger compartment.

There is nothing in the record before us that would permit either the court or a jury to determine which of these two competing aircraft manufacturers had the better designed emergency escape hatch, or to determine that the defendant's hatch design was defective.

In its final analysis, the fallacy of letting an expert witness' unsupported opinion create a fact issue in a case is perhaps better answered by logic than by legal precedent. Illustrative of this is a story told of Abraham Lincoln during his trial lawyer days. Lincoln is said to have cross-examined a witness as follows:

"How many legs does a horse have?"
"Four," said the witness.
"Right," said Abe.

---

[1] It is to be noted that no issue of feasibility is present in this case.

"Now, if you call the tail a leg, how many legs does a horse have?"

"Five," answered the witness.

"Nope," said Abe, "callin' a tail a leg don't make it a leg."[2]

So it is here that merely calling a product unreasonably dangerous does not, without more, make it so.

The plaintiff's case stretches the strict tort liability doctrine further than it was ever intended to go. Neither has the plaintiff established that the manufacturer was negligent in any respect or that it breached any warranty. It was therefore not error to grant the manufacturer's motion for a summary judgment. CR 56.

I would affirm.

Petition for rehearing denied June 6, 1978.

Appealed to Supreme Court June 27, 1978.

---

[2]This story, possibly apocryphal, appeared in 55 A.B.A.J. 818 (1969).